

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

FILED

NOV 8 2010

NOV X 8 2010

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

---

KEVIN TRUDEAU, an individual,

          Plaintiff,

          v.

CONSUMERAFFAIRS.COM, INC.,
a California corporation, JAMES R. HOOD, and
MARK HUFFMAN,

          Defendants.

---

)
)
)
)
)
)
)
)
)
)
)
)

10CV7193
JUDGE LEFKOW
MAG. JUDGE COLE

**JURY DEMAND**

## COMPLAINT

Plaintiff Kevin Trudeau ("Trudeau"), by his attorneys, brings this action for defamation against Defendants ConsumerAffairs.com, Inc., James R. Hood, and Mark Huffman (collectively, "Defendants" or "ConsumerAffairs"), seeking damages, injunctive relief, attorneys' fees and other costs, and other appropriate relief. In support of his claims, Trudeau alleges as follows:

### PARTIES

1.     Plaintiff Kevin Trudeau is an individual who resides in the State of Illinois. Trudeau is an author, consumer advocate and radio host.

2.     Defendant ConsumerAffairs.com, Inc. is incorporated in California and has a place of business at 11400 West Olympic Boulevard, Los Angeles, California. On information and belief, ConsumerAffairs.com, Inc. has its principal place of business in California. ConsumerAffairs.com, Inc. publishes information to viewers of its website, including, on

information and belief, viewers in the State of Illinois and in this District. On information and belief, ConsumerAffairs.com, Inc. has a viewership of approximately 1.5 million persons each month.

3.      Defendant James R. Hood purports to be the founder and Chief Executive Officer of ConsumerAffairs.com, Inc. On information and belief, Mr. Hood resides in Oakton, Virginia and is a citizen of the State of Virginia.

4.      Defendant Mark Huffman is a reporter for ConsumerAffairs.com, Inc. On information and belief, Mr. Huffman resides in and is a citizen of the State of Virginia.

## JURISDICTION AND VENUE

5.      This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because this case presents a controversy between citizens of different states in which the amount in controversy exceeds Seventy-Five Thousand Dollars ($75,000), exclusive of interests and costs.

6.      Venue in this District is proper pursuant to 28 U.S.C. § 1391(a)(2) and/or 28 U.S.C. § 1391(a)(3) in that a substantial portion of the events giving rise to Plaintiff's claim occurred in this District, and each of the named Defendants are subject to personal jurisdiction in this District.

7.      This Court has personal jurisdiction over Defendants ConsumerAffairs.com, Inc., James R. Hood and Mark Huffman because the actions of the Defendants complained of herein occurred in part in this District and the injury to Plaintiff has been and will be felt in this District.

## FACTUAL BACKGROUND

8.      Trudeau is an author, consumer advocate and radio-show host. One of Trudeau's most well-known books is entitled *Natural Cures "They" Don't Want You to Know About.* The

-2-

opinions that Trudeau has expressed in his books and other media are antagonistic to government agencies, the pharmaceutical industry, the food industry, and the banking industry, among others.

9.     Though Trudeau has had disputes with government agencies, he has never been found by any court or other tribunal to be in violation of the FTC Act or any similar consumer fraud law.

10.    ConsumerAffairs.com purports to be a "consumer news and advocacy site founded in 1998 by James R. Hood." (www.consumeraffairs.com/about/) ConsumerAffairs.com receives consumer complaints, and it claims to have access to legal counsel that reviews all such consumer complaints. (*Id.*)

11.    ConsumerAffairs.com purports to "work with responsible media outlets as well as federal, state and local law enforcement agencies to expose and prosecute illegal and unfair business activities." (*Id.*)

12.    ConsumerAffairs.com contends that its website reaches 1.5 million consumers each month, "the vast majority of them in the United States and Canada." (www.consumeraffairs.com/about/advertise.html)

13.    Among ConsumerAffairs.com's "award winning journalists" is Defendant James R. Hood, its CEO and Editor-in-Chief. The ConsumerAffairs site reports that Mr. Hood was formerly the Deputy Director and General Broadcast Editor for the Associated Press, and a former Vice President of UPI. (www.consumeraffairs.com/about/staff.html)

14.    Also among ConsumerAffairs.com's "award winning journalists" is Defendant Mark Huffman. The ConsumerAffairs site describes Mr. Huffman as a Contributing Editor and reports that Mr. Huffman was formerly a news anchor and producer for AP Network News.

15.     On October 26, 2010, ConsumerAffairs.com published on the front page of its site a lead-in article entitled, "What Kevin Trudeau Doesn't Want You to Know." The text of the lead-in article was as follows:

> Don't tell him we told you, but Kevin Trudeau had a bad day in court. A federal appeals court upheld fines totaling millions of dollars and said Trudeau's arguments had "no more substance in them than the ... infomercials." The appeals court upheld a lower court's finding that the onetime king of the infomercial had violated numerous consumer fraud laws. Trudeau is also awaiting sentencing on a criminal contempt charge.

(*See* Exhibit A, attached hereto and made a part hereof.)

16.     It is false that Trudeau has been found by any court to have violated consumer fraud laws. It is also false that Trudeau is awaiting sentencing on a criminal contempt charge or any other criminal charge.

17.     The lead-in article provided a link to a full article entitled, "Kevin Trudeau Loses Appeal of $54 Million Judgment: 1st Circuit Court of Appeals rejects Trudeau's arguments." The byline for the full article was "Mark Huffman, ConsumerAffairs.com." Among other things, the article stated that Trudeau had "lost his bid to overturn a judgment requiring him to pay millions to the Federal Trade Commission" and that Trudeau "awaits sentencing on an unrelated criminal contempt charge." (*See* Exhibit B, attached hereto and made a part hereof.) The article further stated that, "The First Circuit Court of Appeals ruled for the FTC, finding that Trudeau violated the FTC ban on his infomercials as well as numerous consumer fraud laws." (*Id.*) Each of those statements is false.

18.     The publications described in paragraphs 15 and 17 above referred to a ruling by the First Circuit Court of Appeals in *FTC v. Direct Marketing Concepts, Inc. et al.*, Case No. 09-2172 (hereafter "*FTC v. Direct Marketing Concepts*"). (A full copy of the opinion is attached hereto as Exhibit C.) That case is an appeal from a judgment by the United States District Court

for the District of Massachusetts. The First Circuit opinion nowhere indicates that Trudeau was a party to the case. Trudeau is not, and never has been, a party to the *FTC v. Direct Marketing Concepts* case, either in the district court or in the Court of Appeals.

19.     Accordingly, it is false that the First Circuit Court of Appeals has affirmed any judgment against Trudeau, or has upheld any finding that Trudeau violated consumer fraud laws.

20.     It also is false that Trudeau is "awaiting sentencing on a criminal contempt charge." The First Circuit opinion in *FTC v. Direct Marketing Concepts* makes no such statement. Trudeau has no standing criminal conviction against him of any kind.

21.     Both of the publications described in paragraphs 15 and 17 above quote from the First Circuit opinion in *FTC v. Direct Marketing Concepts*. Accordingly, on information and belief, at the time the publications were made, Defendants possessed or had access to the full opinion in *FTC v. Direct Marketing Concepts*. On information and belief, Defendants knew that the statements described in paragraphs 15 and 17 above were false, or, at minimum, acted recklessly with regard to their truth or falsity.

22.     On October 26, 2010, at approximately 6:48 p.m., Trudeau's counsel sent a letter by email to ConsumerAffairs.com notifying the Defendants of their erroneous publications and requesting that Defendants immediately retract the incorrect statements. (*See* Exhibit D, attached hereto.) Trudeau's counsel also left a voice-mail message on that same day at the telephone number provided on ConsumerAffairs.com's website. There was no response.

23.     On October 27, 2010, Trudeau's counsel left another voice-mail message for Defendant James Hood at the ConsumerAffairs.com telephone number. On the same date, at approximately 3:44 p.m., Trudeau's counsel sent a letter by email and by Federal Express to ConsumerAffairs.com, addressed to Mr. Hood, again demanding a full retraction of the false and

defamatory publications. (*See* Exhibit E, attached hereto.) The letter advised Defendants that Trudeau reserved the right to pursue all available legal remedies. (*Id.*)

24.     On October 28, 2010, Trudeau's counsel received a telephone call from counsel for Defendants, in which Trudeau's counsel once again demanded a full retraction of the false and defamatory publications. Defendants' counsel indicated that he would take the matter under advisement. On the same date, at approximately 3:40 p.m., Trudeau's counsel sent an email to Defendants' counsel, noting that both of the defamatory publications remained on Defendants' website, and requesting that both publications be immediately removed from the site while Defendants were taking under advisement Trudeau's request that Defendants publish a retraction. (*See* Exhibit F, attached hereto.)

25.     On October 29, 2010, Trudeau's counsel received a letter from Defendants' counsel stating that revisions had been made to the subject article. (*See* Exhibit G, attached hereto.) There was no offer to remove the false and defamatory publications, or to publish a retraction. (*Id.*)

26.     The Defendants' revisions to the subject article did not purge the article of its false and defamatory statements concerning Trudeau. (*See* Exhibit H, attached hereto.) The revised headline stated, "Appeals Court Upholds FTC in Kevin Trudeau Case." That statement falsely implied that Trudeau was a party, if not *the* party, in the case. The revised publication thus falsely implied that the court had ruled that Trudeau "engaged in deceptive advertising, committed consumer fraud and violated an FTC order banning Trudeau from doing any further infomercials." (*Id.*) The revised publication also falsely stated that "the First Circuit found the lower courts ruled correctly in ordering Trudeau and the other defendants to turn over the gross receipts from the sale of the products." (*Id.*)

-6-

27.     On October 29, 2010, Trudeau's counsel responded that Defendants' revisions to the subject article did not address Trudeau's concerns, and once again demanded that the false and defamatory publications be completely removed from the Defendants' website and that the Defendants publish a full retraction. (*See* Exhibit I, attached hereto.) The letter requested that Defendants accomplish those corrective measures by the end of the day on Sunday, October 31, 2010, in order to avoid legal action. (*Id.*)

28.     On October 30, 2010, Defendants' counsel emailed Trudeau's counsel advising that the "article no longer appears on Consumer Affairs' website[,]" but not offering to publish a retraction. (*See* Exhibit J, attached hereto.)

29.     As of this filing, the Defendants have failed to publish a retraction of the false and defamatory statements that it published to third parties concerning Trudeau.

30.     In summary, on information and belief, Defendants reported on a court case to which they knew Trudeau was not a party, and falsely reported that Trudeau *was* a party to the case, and that the court had affirmed a judgment against Trudeau and had upheld findings that Trudeau violated numerous consumer fraud laws.  Defendants Hood and Huffman are experienced journalists, and it is inconceivable that they would have published the subject articles without having reviewed the First Circuit opinion about which they were reporting. Indeed, the subject articles contained quotes from the First Circuit opinion, and thus one or more of the Defendants necessarily read the First Circuit opinion in order to extract the quotations. The First Circuit opinion is not ambiguous or unclear as to the identity of the parties to that case.

31.     With regard to the statement that Trudeau is awaiting sentencing on a criminal contempt charge, even minimal fact checking would have revealed that Trudeau does not have a

standing criminal conviction against him and is not awaiting sentencing on a criminal contempt charge.

32.    Any doubt about the Defendants' intentions with regard to the subject articles was dispelled by the Defendants' resistance to removing the articles from the ConsumerAffairs.com website, and their refusal to publish a retraction, even though they have not disputed, and could not in good faith dispute, that the articles contain patently false statements concerning Trudeau. Indeed, the Defendants' "revision" of the article was a disingenuous attempt to preserve the false and defamatory message that had been disseminated by the original publications.    And the refusal to publish a retraction evidences that it is Defendants' intent that the defamatory message they know to be false be perpetuated.

## CAUSE OF ACTION

### Defamation

33.    Plaintiff realleges the allegations of paragraphs 1- 32 above as though fully set forth herein.

34.    Defendants have published, on the ConsumerAffairs.com website, false and defamatory statements concerning Plaintiff Trudeau, including statements that:

- the First Circuit Court of Appeals "upheld a lower court's finding that [Trudeau] had violated numerous consumer fraud laws";

- "Trudeau is also awaiting sentencing on a criminal contempt charge";

- Trudeau "lost his bid to overturn a judgment requiring him to pay millions to the Federal Trade Commission";

- "The First Circuit Court of Appeals ruled for the FTC, finding that Trudeau violated the FTC ban on his infomercials, as well as numerous consumer fraud laws"; and

- the district court found Trudeau "liable for deceptive advertising."

35.     Each of those statements is false.    The Defendants' false statements are defamatory *per se* because they impute to Plaintiff the commission of serious crimes and/or fraud.

36.     Defendants' statements were published to third parties without authorization or privilege.

37.     Defendants have acted with actual malice.    Defendants made the defamatory statements with knowledge of their falsity or with reckless disregard of their truth or falsity. Defendants have refused to publish a retraction of the false and defamatory publications.

38.     As a direct and proximate cause of Defendants' defamatory statements, Plaintiff has suffered, and will continue to suffer, injury to his reputation.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in favor of Plaintiff and against Defendants granting the following relief:

(a)     injunctive relief in the form of a preliminary and permanent injunction ordering Defendants to publish a retraction of the false and defamatory statements concerning Trudeau that appeared on ConsumerAffairs.com, Inc.'s website, and that the retraction be placed on ConsumerAffairs.com's front page or home page, with the same prominence as was given the publication of the false and defamatory statements;

(b)     compensatory damages in the amount of $10 million or otherwise in an amount to be determined at trial;

(c)     punitive damages in the amount of $20 million or otherwise in an amount of to be determined at trial;

(d)     attorneys' fees and costs; and

(e)     an award of such other relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury of all issues so triable.

Respectfully submitted,

KEVIN TRUDEAU

By: _Daniel J. Hurtado_____
One of His Attorneys

Daniel J. Hurtado (ARDC 6217466)
841 North Grove Avenue
Oak Park, Illinois  60302
708-289-2503
Dhurtado2@att.net

-10-

# EXHIBIT A

ConsumerAffairs.com: Knowledge is Power! Consumer news, reviews, complaints, resour... Page 1 of 5

Case: 1:10-cv-07193 Document #: 1 Filed: 11/08/10 Page 12 of 79 PageID #:12

**CONSUMERAFFAIRS.COM**

NEWS | RECALLS | COMPLAINT FORM | SCAM ALERTS |
RESOURCES
Small Claims Guide · Class Actions · Lemon Laws · FAQ · Newsletters


**COMPLAINT BUTTON**
Complain about a product or service

Automotive  Education  Employment  Electronics  Family  Finance  Health  Homeowners  Insurance  Pets  Shopping  Travel

**CHASE® Credit Cards** Apply Now. Good Credit? 0% Intro APR, 5% CashBack or 10k Points. www.CHASE.com/Cards
**How to Remove Charge Offs** I Got My Charge Offs Removed. I Raised My Score Over 200 Points! www.CreditRepairGu
**Bank of America Cash Back** Visit Now and Get 1% Cash Back with BankAmericard Cash Rewards™ Card. www.Ban
Ads by Google

[_____]  [ Search ]

## What Kevin Trudeau Doesn't Want You to Know

Don't tell him we told you, but
Kevin Trudeau had a bad day in
court. A federal appeals court
upheld fines totaling millions of
dollars and said Trudeau's
arguments had "no more
substance in them than the ...
infomercials." The appeals court
upheld a lower court's finding
that the onetime king of the
infomercial had violated
numerous consumer fraud laws.
Trudeau is also awaiting
sentencing on a criminal
contempt charge. Read more



## FEATURED COMPLAINTS

### Verizon – John of Phoenix, Ariz.

"Wife got billed $20 a month for the longest time and thought it was
because I was texting her via Yahoo. Come to find out, it was one of
those "subscriptions" that never actually do anything but bill you.
Anymore, there is NO reason to have a contract with a cell phone
company. Monthly pay-as-you-go plans are now much cheaper than
contracts..." Read more

### Hollywood Video – Trannon of Edmund, Okla.

"On Oct 26 2010, I received a notice from CCS about an outstanding
debt from Hollywood Video in the amount of $107.66. I called CCS to
contest this and they also tried to conveniently "lower" my settlement
to $33. I refused since all the movies they claim were still outstanding
had all been returned. Additionally, I was on the original rental plan
($14/mo for 2 videos at a time w/ no late fees) and canceled the plan
when they went to the outrageous "PowerPlay" plan. I told CCS to
cease contact and I would contest the bad debt on my credit bureau if
it showed up there." Read more

## Jillian Michaels - Fitness Guru or Actress?

Jillian Michaels of "Biggest
Loser" fame presents herself as
a trained and skillful personal
trainer. But no less a weighty
authority than the Los
Angeles Times calls her "an
actress playing the role of
fitness trainer." Who's right?
Jillian is threatening to let the
courts decide, saying her
critics' comments amount to
defamation. But what's most
important for consumers is to
recognize that there is no
quick fix to obesity – and TV



### CONSUMER NEWS

- Billionaire George Soros to Put His Money behind
  Legalizing Marijuana in California
- Aspirin May Improve Prostate Cancer Survival Odds
- Firesheep Is Latest Headache For Computer Users
- Barbershops Could Become Health Clinics in African-
  American Communities
- Boston Market Wants to Take Things Slow in Order
  to Speed up Profits
- More News ...

### TOP COMPANY COMPLAINTS

- Chase Mortgage
- Chase Credit Cards
- Bank of America
- University of Phoenix
- Lending Tree
- Quicken Loans
- eHarmony.com
- Samsung TV
- JK Harris
- Amerisave Mortgage
- People to People
- Maytag Washers
- Your Baby Can Read
- Classmates.com
- Capital One
- Nutrisystem
- Trugreen

### MOST-VIEWED PAGES

- People to People: How Selective is it?
- Do You Really Need An Anti-Virus Program?
- Buying a Home in Foreclosure: What You Need to
  Know
- Do Swimming Pools Cause Cancer?
- Foreclosure Process Short-Circuited by Mortgage
  Company's Short Cut
- Wal-Mart Offers No-Contract 'Post-Paid' Cell
  Phones

### NEW COMPLAINTS

- New York University
- Target Credit Card
- Credit Restoration Service
- CompuCredit
- LendSelect Mortgage
- First Savings Mortgage
- GadgetTown.com
- Franklin Credit Management Corp
- Loanstar Title Loans

### SAFETY RECALLS

- GE Recalls 174,000 Profile, Monogram Dishwashers
- Honda Recalls 2005-2007 Odyssey, Acura RL
  Vehicles
- Mega Pops Manufacturer Launches Recall Effort
- Hyland's Teething Tablets Recalled
- Klement Sausage Recalls Beef Sticks
- More Recalls ...

### FREE CONSUMER NEWSLETTERS

**The Daily Consumer**
Afternoons M-F
Sign up now!

**Consumer News & Alerts**
Every Sunday
Sign up now!

# EXHIBIT B

**CONSUMERAFFAIRS.COM**    NEWS  RECALLS  COMPLAINT FORM  SCAM ALERTS  RESOURCES    SHARE    COMPLAINT BUTTON
Small Claims Guide  Class Actions  Lemon Laws  FAQ  Newsletters    Complain about a product or service

Automotive  Education  Employment  Electronics  Family  Finance  Health  Homeowners  Insurance  Pets  Shopping  Travel    Print This    Email This

Search

NEWS  Latest | Archives | Auto | Cells, etc. | Computers | Financial | Health | Homeowners | Parents | Privacy | Scams | Seniors | Travel

## Kevin Trudeau Loses Appeal Of $54 Million Judgment

**1st Circuit Court of Appeals rejects Trudeau's arguments**

**Mark Huffman**
**ConsumerAffairs.com**

*October 26, 2010*

Infomercial king Kevin Trudeau, who hawks such books as "Natural Cures They Don't Want You To Know About," has lost his bid to overturn a judgment requiring him to pay millions to the Federal Trade Commission. He awaits sentencing on an unrelated criminal contempt charge.

The First Circuit Court of Appeals ruled for the FTC, finding that Trudeau violated the FTC ban on his infomercials, as well as numerous consumer fraud laws.

"The Defendants in this case made millions off infomercials shilling purported panaceas, products that they claimed cured literally every disease, from cancer to Parkinson's to obesity," the justices wrote. "Having been ordered to restore these millions to the customers they deceived, the Defendants now raise a multitude of challenges to two decisions of the district court: first, the court's grant of summary judgment in favor of the plaintiff Federal Trade Commission (FTC), finding the Defendants liable for deceptive advertising; and second, the court's determination of damages after a bench trial on that issue. Despite the volume of the Defendants' arguments, we find no more substance in them than the district court found in their infomercials. We therefore affirm the district court in toto."

The defendants filing the appeal were Direct Marketing Concepts, Inc. (DMC), ITV Direct, Inc. (ITV), Donald Barrett, Robert Maihos, and BP International (BP). Barrett and Maihos co-own ITV and DMC, both Massachusetts corporations; generally, ITV produces infomercials, and DMC distributes the infomercials, answers calls, and processes orders. BP is a holding corporation to which Barrett eventually (and secretly) transferred some of DMC's assets.



- Kevin Trudeau-Inspired Weight Loss Web Site Launched
- Kevin Trudeau Banned from Infomercials—Again
- Kevin Trudeau's 'Natural Cures' Agrees to Missouri Refunds
- Kevin Trudeau Now Offering 'Debt Cures'
- Feds Sue Trudeau Marketers
- Feds Sue Infomercial Maestro Kevin Trudeau Again
- FTC: Dietary Supplements Don't Deliver
- Trudeau Sells Customer Names to Junk Mailers
- Judge Refuses to Gag Trudeau Critics
- Consumer Agency Trashes Trudeau's 'Natural Cures' Book
- Kevin Trudeau Banned from Infomercials
- Supreme Greens, Coral Calcium Daily Give FTC Indigestion
- Coral Calcium Promoters Face Federal Charges
- Coral Calcium Claims Debunked

- Consumer complaints about Trudeau
- Trudeau Defenders



If You Haven't Had A Ticket In The Last 3 Years, You Are Paying Too Much For Auto Insurance
SELECT YOUR AGE: 33
Calculate New Payment

### CONSUMER NEWS

- Billionaire George Soros to Put His Money behind Legalizing Marijuana in California
- Aspirin May Improve Prostate Cancer Survival Odds
- Firesheep Is Latest Headache For Computer Users
- Barbershops Could Become Health Clinics in African-American Communities
- Boston Market Wants to Take Things Slow in Order to Speed up Profits
- More News ..

### SAFETY RECALLS

- GE Recalls 174,000 Profile, Monogram Dishwashers
- Honda Recalls 2005-2007 Odyssey, Acura RL Vehicles
- Mega Pops Manufacturer Launches Recall Effort
- Hyland's Teething Tablets Recalled
- Klement Sausage Recalls Beef Sticks
- More Recalls ..

### LATEST RATES

| Savings | Mortgage | Auto | Insurance | Credit Cards |
| --- | --- | --- | --- | --- |

### TOP COMPANY COMPLAINTS

- Chase Mortgage
- Chase Credit Cards
- Bank of America
- University of Phoenix
- Lending Tree
- Quicken Loans
- eHarmony .com
- Samsung TV



**Return To School Online With A Grant See If You Qualify!**

Click Your Age

| 15 | 26 | 27 | 28 | 29 |
|---|---|---|---|---|
|  | 31 | 32 | 33 | 34 |
| PG | 37 | 38 | 39 |
|  |  | 42 | 43 | 44 |
|  | 47 | 48 | 49 |
| 50 |  |  | 53 | 54 |
| 55 |  |  |  | 59 |
| 60 | 61 |  |  | 64 |
| 65 | 66 |  |  | 69 |
| 70 | 71 | 72 |  |  |

classesUSA

## Coral Calcium

Beginning in late 2001, DMC, Barrett, and Maihos became involved in marketing the product Coral Calcium by producing and distributing an infomercial promoting that product. These defendants then processed calls and sold Coral Calcium to consumers.

The infomercial for Coral Calcium relied on the purported expertise of Robert Barefoot. In the infomercial, Barefoot asserted a number of claims regarding coral-derived calcium and its supposed biological and medical properties. Barefoot claimed that all diseases are caused by a condition called acidosis:

"Are you getting the minerals? And if you're not, you will become acidic and you will get one of the major diseases," the pitch went. "You can have heart disease, cancer, lupus, fibromyalgia, multiple sclerosis. Name the disease, they're all caused by acidosis."

Barefoot then claimed that calcium derived from Okinawan coral cures these diseases:

"[W]e've been studying the coral calcium and I can tell you there are tens of millions of people, millions of testimonials," he said in the infomercial. "I've had 1,000 people tell me how they've cured their cancer. I've witnessed people get out of wheelchairs with multiple sclerosis just by getting on the coral."

The court's ruling quoted from a portion of the infomercial:

**Miracle cure**

Trudeau (host): Pain, talk about pain. Read in your book if a person has pain, muscle pain, joint pain –

Barefoot: Yes, yes.

Trudeau: – they take calcium –

Barefoot: Yes.

Trudeau: – their body turns from acid to alkaline, pain goes away.

Barefoot: That's exactly –

Trudeau: Is that common?

Barefoot: Yes, yes, very common.

Barefoot went on to claim that coral-derived calcium is superior to other sources of calcium because it is 100 percent bioavailable, meaning that all coral-derived calcium that is ingested is also absorbed into the body. To bolster his claims, Barefoot noted that unspecified articles from the Journal of the American Medical Association and the New England Journal of Medicine "said that calcium supplements reverse cancer . . . that's a quote."

The infomercial directed potential customers to call an 800 number, on the other end of which DMC-employed telemarketers would follow a script directing them to tell potential customers that the product Coral Calcium would be 100 percent absorbed by their bodies and would combat degenerative diseases by rendering an acidic body more alkaline.

Telemarketers were also directed to tell sick customers that they should take higher doses of Coral Calcium, up to three times the standard dose. During the relevant time period (from January 2002 to July 2003), the Coral Calcium infomercial generated $54,034,394.82 in sales, of which approximately $575,000 were transferred to Defendant BP.

In its ruling, the 1st Circuit found the lower courts ruled correctly in ordering Trudeau and the other defendants to turn over the gross receipts from the sale of the products.

"On a well-developed record that reveals no significant factual disputes, the district court correctly granted summary judgment to the FTC on the issue of the Defendants' liability for deceptive advertising," the justices wrote.

- JK Harris
- Amerisave Mortgage
- People to People
- Maytag Washers
- Your Baby Can Read
- Classmates.com
- Capital One
- Nutrisystem
- Trugreen

**MOST-VIEWED PAGES**

- People to People: How Selective is It?
- Do You Really Need An Anti-Virus Program?
- Buying a Home in Foreclosure: What You Need to Know
- Do Swimming Pools Cause Cancer?
- Foreclosure Process Short-Circuited by Mortgage Company's Short Cut
- Wal-Mart Offers No-Contract 'Post-Paid' Cell Phones

**NEW COMPLAINTS**

- New York University
- Target Credit Card
- Credit Restoration Service
- CompuCredit
- LendSelect Mortgage
- First Savings Mortgage
- GadgetTown.com
- Franklin Credit Management Corp
- Loanstar Title Loans



Click here to join and get $75 in free driving.



The Asian secret to strong, lush hair

Shocking discovery for joint relief

5-day laser spine surgery: pre-op to recovery

## Report Your Experience

If you've had a bad experience -- or a good one -- with a consumer product or service, we'd like to hear about it. All complaints are reviewed by class action attorneys and are considered for publication on our site. Knowledge is power! Help spread the word. File your consumer report now.

## Free Consumer Newsletters

**The Daily Consumer**
Afternoons M-F
Sign up now!

**Consumer News & Alerts**
Every Sunday
Sign up now!

 Find us on Facebook      twitter

## Find the Best Rates

| Savings | Mortgage | Auto | Insurance | Credit Cards |
|---|---|---|---|---|

| Loan type | Rate | +/- | Last week |
|---|---|---|---|
| MMA | 0.68% | — | 0.68% |
| 6 month CD | 0.67% | ▼ | 0.68% |
| 1 yr CD | 0.97% | --- | 0.98% |
| 1 yr CD Jumbo | 1.02% | — | 1.03% |
| 5 yr CD | 2.07% | ▼ | 2.09% |

Select product and compare rates:

1-year CD [ ] Go

PROVIDED BY
Bankrate.com

Back to the top |

Advertisement



WE'RE GOING YOUR WAY     Save $25 off a one-way rental     GET THIS DEAL     AVIS

Ads by Google    Aetna Medicare RX    M4M World    Samp Servers    3 D Glass

# CONSUMERAFFAIRS.COM

**AUTOMOTIVE**
• Dealers
• Manufacturers
• Service
• Extended Warranties
• Lemon Laws
• Recalls
• Tires
• Towing
• Transporters

**DINING**
• Food Products
• Restaurants

**BUSINESS SERVICES**
• Services for Businesses

**FINANCE**
• Annuities
• Banks
• Credit Cards
• Debt Collection
• Debt Counseling
• Insurance
• Investing
• Loans
• Mortgages
• Payday Loans
• Student Loans
• Tax Prep

**HEALTH**
• Dentists
• Doctors
• Drugs, Pharmacies

**HOUSE & HOME**
• Appliances
• Cookware
• Furniture
• Home Improvements
• Lawn & Garden
• Movers
• Pools & Spas
• Realtors, Rental Agents
• Recalls
• Storage Services
• Utilities

**ELECTRONICS**
• Cable TV/DBS
• Cameras
• Cell Phones
• Computers

**RECREATION**
• Boats
• Sporting Goods

**SHOPPING**
• Delivery Services
• In-Home
• Online
• Retail Stores
• Supermarkets
• Telemarketers

**TRAVEL**
• Airlines
• Bus Lines
• Car Rental
• Cruises

**CONSUMER NEWS**
• Latest News
• Automotive
• Telecom
• Financial
• Health
• Homeowners
• Scams
• Seniors
• Travel
• More ...

**RECALLS**
• Automotive
• Children's Products
• Drugs
• Food
• Household Products

- Work at Home

FAMILY
- Aging
- Children, Parenting
- Recalls
- Dating
- Education
- Entertainment
- Modeling & Talent Agencies
- Pets
- Weddings

- Health Clubs
- Hearing Care
- Hospitals
- Nursing Homes
- Nutrition, Diets
- Vision Care
- Weight Loss

- Home Electronics
- Internet Access
- Local Phone Service
- Long Distance
- VoIP

- Hotels
- Travel Agents
- Trains

RESOURCES
- Class Actions
- Complaint Form
- Small Claims Guide
- Lemon Laws

- Sporting Goods

ABOUT US
- FAQ
- Privacy Policy
- Advertise With Us
- Newsroom
- Syndication
- Terms of Use

---

**Terms of Use** Your use of this site constitutes acceptance of the Terms of Use

**Advertisements** on this site are placed and controlled by outside advertising networks. ConsumerAffairs.com does not evaluate or endorse the products and services advertised. See the FAQ for more information.

**Company Response Welcome** If complaints about your company appear on our site, we welcome your response. Please see the Response Form for more information.

**For more information**, see the FAQ and privacy policy. The information on this Web site is general in nature and is not intended as a substitute for competent legal advice. ConsumerAffairs.com Inc. makes no representation as to the accuracy of the information herein provided and assumes no liability for any damages or loss arising from the use thereof.

**Copyright © 2010 ConsumerAffairs.com Inc.** All Rights Reserved.   The contents of this site may not be republished, reprinted, rewritten or recirculated without written permission.

`

# EXHIBIT C

# United States Court of Appeals
## For the First Circuit

No. 09-2172

FEDERAL TRADE COMMISSION,

Plaintiff, Appellee,

v.

DIRECT MARKETING CONCEPTS, INC., d/b/a Today's Health and Direct
Fulfillment; ITV DIRECT, INC., d/b/a Direct Fulfillment; DONALD
W. BARRETT; ROBERT A. MAIHOS; BP INTERNATIONAL, INC.,

Defendants, Appellants,

HEALTHY SOLUTIONS, LLC, d/b/a Direct Business Concepts; HEALTH
SOLUTIONS, INC.; ALEJANDRO GUERRERO, d/b/a Alex Guerrero; MICHAEL
HOWELL; GREG GEREMESZ; TRIAD ML MARKETING, INC.; KING MEDIA,
INC.; ALLEN STERN; LISA STERN; STEVEN RITCHEY,

Defendants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. George A. O'Toole, U.S. District Judge]

Before
Boudin, Dyk,[*] and Thompson,
Circuit Judges.

Peter S. Brooks, with whom Susan W. Gelwick, Christopher F.
Robertson, and Seyfarth Shaw LLP were on brief, for appellants.
Lawrence DeMille-Wagman, Assistant General Counsel for
Litigation, Federal Trade Commission, with whom Willard K. Tom,
General Counsel, and John F. Daly, Deputy General Counsel for
Litigation, were on brief, for appellee.

_____

[*] Of the Federal Circuit, sitting by designation.

_____

October 21, 2010

_____

**THOMPSON, Circuit Judge.**   The Defendants in this case made millions off infomercials shilling purported panaceas, products that they claimed cured literally every disease, from cancer to Parkinson's to obesity.   Having been ordered to restore these millions to the customers they deceived, the Defendants now raise a multitude of challenges to two decisions of the district court: first, the court's grant of summary judgment in favor of the plaintiff Federal Trade Commission (FTC), finding the Defendants liable for deceptive advertising; and second, the court's determination of damages after a bench trial on that issue. Despite the volume of the Defendants' arguments, we find no more substance in them than the district court found in their infomercials.   We therefore affirm the district court in toto.

## I. BACKGROUND

### A. The Coral Calcium infomercial.

For purposes of introduction, a fairly simple recitation of only the uncontested facts will suffice.   Greater detail will follow as necessary in the discussion section.

The Defendants on appeal are Direct Marketing Concepts, Inc. (DMC), ITV Direct, Inc. (ITV), Donald Barrett, Robert Maihos, and BP International (BP).[1]   Barrett and Maihos co-own ITV and DMC,

---

[1] We capitalize the word Defendant to refer to the Defendants on appeal, using lowercase when non-appellants are included, and

-3-

both Massachusetts corporations; generally, ITV produces infomercials, and DMC distributes the infomercials, answers calls, and processes orders. BP is a holding corporation to which Barrett eventually (and secretly) transferred some of DMC's assets.

Beginning in late 2001, DMC, Barrett, and Maihos became involved in marketing the product Coral Calcium by producing and distributing an infomercial promoting that product. These Defendants then processed calls and sold Coral Calcium to consumers.

The infomercial for Coral Calcium relied on the purported expertise of Robert Barefoot. In the infomercial, Barefoot asserted a number of claims regarding coral-derived calcium[2] and its supposed biological and medical properties. Barefoot claimed that all diseases are caused by a condition called acidosis:

> Are you getting the minerals? And if you're
> not, you will become acidic and you will get
> one of the major diseases. You can have heart
> disease, cancer, lupus, fibromyalgia, multiple
> sclerosis. Name the disease, they're all
> caused by acidosis.

Barefoot then claimed that calcium derived from Okinawan coral cures these diseases:

---

providing clarification as appropriate.

[2] The name of the product was not featured in the infomercial, which only referred generally to the purported healing properties of calcium derived from coral skeletons harvested off the coast of Okinawa, Japan.

-4-

> [W]e've been studying the coral calcium and I
> can tell you there are tens of millions of
> people, millions of testimonials. I've had
> 1,000 people tell me how they've cured their
> cancer. I've witnessed people get out of
> wheelchairs with multiple sclerosis just by
> getting on the coral.

Barefoot asserted that coral-derived calcium was an effective cure

for these diseases because it renders the body more alkaline,

thereby curing acidosis:

> Barefoot: By the time the average American is
> 35, he has more calcium going out of his body
> and into the body and that's when it starts.
> By the time he's 60, 98 percent are totally
> calcium deficient and that's why we have
> people over 60 with heart disease, you know,
> Lupus, Parkinson's. All these diseases are
> caused by acidosis.
>
> . . .
>
> Trudeau (host[3]): Pain, talk about pain. Read
> in your book if a person has pain, muscle
> pain, joint pain –
>
> Barefoot: Yes, yes.
>
> Trudeau: – they take calcium –
>
> Barefoot: Yes.
>
> Trudeau: – their body turns from acid to
> alkaline, pain goes away.
>
> Barefoot: That's exactly –

---

[3] Host Kevin Trudeau's issues with the FTC present a whole other
story, set forth in FTC v. Trudeau, 579 F.3d 754, 757-62 (7th Cir.
2009) (including a brief discussion of Trudeau's involvement with
the Coral Calcium infomercial).

-5-

Trudeau: Is that common?

Barefoot: Yes, yes, very common.

Barefoot went on to claim that coral-derived calcium is superior to other sources of calcium because it is 100% bioavailable, meaning that all coral-derived calcium that is ingested is also absorbed into the body. To bolster his claims, Barefoot noted that unspecified articles from the Journal of the American Medical Association and the New England Journal of Medicine "said that calcium supplements reverse cancer . . . that's a quote."

The infomercial directed potential customers to call an 800 number, on the other end of which DMC-employed telemarketers would follow a script directing them to tell potential customers that the product Coral Calcium would be 100% absorbed by their bodies and would combat degenerative diseases by rendering an acidic body more alkaline. Telemarketers were also directed to tell sick customers that they should take higher doses of Coral Calcium, up to three times the standard dose. During the relevant time period (from January 2002 to July 2003), the Coral Calcium infomercial generated $54,034,394.82 in sales, of which approximately $575,000 were transferred to Defendant BP.

**B. The Supreme Greens infomercial.**

As with Coral Calcium, the Defendants were involved collectively in the production and airing of an infomercial for the

-6-

product "Supreme Greens," also called "Supreme Greens with MSM."
ITV produced the infomercial, which Barrett hosted; DMC processed
calls and orders under Maihos's direction.

The infomercial for Supreme Greens relied on the
purported expertise of "Dr." Alejandro Guerrero.[4] Like Barefoot,
Guerrero claimed that many major diseases are caused by acidosis,
and that these diseases can be prevented and cured by rendering the
body more alkaline:

> Barrett: Dr. Guerrero claims that most chronic
> degenerative diseases – such as cancer,
> arthritis, diabetes, even the number one
> killer out there, heart disease – can and are
> being cured . . . .
>
> Guerrero: So if we can change the body's
> fluids and tissues to a more alkaline base,
> now you have an environment that is no longer
> conducive for the proliferation or growth of a
> degenerative condition. . . .
>
> Barrett: . . . If I alkalize my body, am I
> going to come up with one of these chronic
> degenerative diseases?
>
> Guerrero: No.
>
> Barrett: Such as cancer, arthritis –
>
> Guerrero: No. . . . I'm very confident in
> saying that, primarily because of the clinical
> studies we've done. I've seen it in my – in
> my – clinical practice. I've seen it every
> day in my clinical practice.

---

[4] The infomercial presented Guerrero as a "Doctor of Oriental
Medicine," but Guerrero did not have any such degree.

-7-

Going beyond even Barefoot, Guerrero also claimed that Supreme Greens can cause weight loss by restoring alkalinity because "fat is your body's way of protecting itself from the acidic fluids."

The infomercial directed potential customers to call an 800 number, on the other end of which DMC-employed telemarketers would follow a script directing them to ask potential customers about their health issues and then explain how Supreme Greens supposedly could address those issues. For example, if a customer said she had cancer, the telemarketer was supposed to respond that "cancer is acidosis of the body and Supreme Greens alkalizes the body, and that's what you need, so you really want to take this." During the relevant time period (August 2003 to June 2004), Supreme Greens generated $14,683,436.24 in sales.

## C. The FTC action.

In June 2004, the FTC filed a complaint in the United States District Court for the District of Massachusetts against a number of parties,[5] alleging violations of the FTC Act, 15 U.S.C. §§ 45 and 52. The FTC sought both injunctive relief and monetary equitable relief in order to redress customers who had purchased Coral Calcium or Supreme Greens in reliance on the Defendants'

---

[5] Including, among others, the Defendants on appeal as listed above, as well as Triad ML Marketing, Inc. (Triad), a corporation which will become relevant later.

allegedly deceptive infomercials. In July 2008, the district court
granted summary judgment against the Defendants on the issue of
liability, holding that the challenged infomercials were misleading
as a matter of law.   In August 2009, after a bench trial, the
district court entered two Final Orders and Judgments permanently
enjoining the Defendants from running their deceptive infomercials
and ordering disgorgement from the Defendants (excluding BP) in the
amount of $48,220,499.12 and from BP in the amount of $574,274.23.
The Defendants now appeal.

## II. DISCUSSION

The Defendants take a shotgun approach to their appeal,
asserting that: (1) the district court applied an incorrect
standard in finding them liable for deceptive advertising; (2) the
record contained issues of fact as to whether they possessed
sufficient substantiation for the claims asserted in the
infomercials; (3) the claims made in the infomercials were mere
puffery and were mollified by disclaimers, and therefore were not
actionable; (4) Maihos is not individually liable as a matter of
law; (5) the district court erred in calculating damages on the
basis of the Defendants' gross receipts rather than net profits;
(6) the district court erred in determining damages from January
2002 to February 2003; (7) the district court erred in determining

-9-

damages from March 2003 to July 2003; and (8) the district court
erred in determining damages from August 2003 to June 2004.

The FTC seeks to uphold the judgment of the district
court in all respects, asserting that: (1) the district court
applied a correct standard in finding the Defendants liable for
deceptive advertising; (2) the record contained vast swaths of
uncontradicted evidence supporting the Defendants' lack of adequate
substantiation for the claims asserted in the infomercials; (3) the
claims in the infomercials were specific and definite and therefore
not exempted from liability under the puffery or disclaimer rules;
(4) as half-owner and officer of DMC, Maihos is individually
liable; (5) the district court has broad discretion to fashion an
equitable remedy, and exercised the discretion appropriately and in
accordance with precedent; (6) the district court did not err in
determining damages from January 2002 to February 2003; (7) the
district court did not err in determining damages from March 2003
to July 2003; and (8) the district court did not err in determining
damages from August 2003 to June 2004.

This Court has jurisdiction under 28 U.S.C. § 1291. We
review de novo both the district court's decision to grant a
summary judgment motion, see Zimmerman v. Puccio, 613 F.3d 60, 70
(1st Cir. 2010), and the district court's legal determinations
after a bench trial, overturning the district court's factual

-10-

determinations after a bench trial only in the case of clear error, see Wojciechowicz v. United States, 582 F.3d 57, 66 (1st Cir. 2009). Applying these familiar standards to the Defendants' arguments as appropriate, we see no need to diverge from the district court on any point.

## A. The "reasonable basis" test is appropriate for deceptive advertising claims.

The Defendants challenge both the legal and factual bases for the district court's grant of summary judgment. We begin by teasing out the applicable law.

Our starting point is the FTC statute, which provides that both "unfair or deceptive acts or practices in or affecting commerce" (15 U.S.C. § 45(a)(1)) and "disseminat[ing], or caus[ing] to be disseminated, any false advertisement . . . in or having an effect upon commerce" (15 U.S.C. § 52(a)) are "unlawful." 15 U.S.C. § 55 defines the term "false advertisement" as "an advertisement, other than labeling, which is misleading in a material respect . . . ." Given the strong similarity between the terms "deceptive" and "misleading", it is no surprise that sections 45 and 52 are sometimes applied in tandem as the basis for an FTC action against an alleged false advertiser; indeed, such a tandem reading is expressly allowed by 15 U.S.C. § 52(b).

-11-

When the FTC brings an action based on the theory that advertising is deceptive because the advertisers lacked a reasonable basis for their claims, the FTC must: (1) demonstrate "what evidence would in fact establish such a claim in the relevant scientific community"; and (2) "compare[] the advertisers' substantiation evidence to that required by the scientific community to see if the claims have been established." Removatron Intern. Corp. v. FTC, 884 F.2d 1489, 1498 (1st Cir. 1989) (applying to administrative determination of deceptive advertising); see also FTC v. Garvey, 383 F.3d 891, 901 (9th Cir. 2004) (applying the same test to claims by FTC in court). Where the advertisers lack adequate substantiation evidence, they necessarily lack any reasonable basis for their claims. See Removatron, 884 F.2d at 1498. And where the advertisers so lack a reasonable basis, their ads are deceptive as a matter of law. Id.

The Defendants argue that there is a third prong to a deceptive advertising claim, asserting that the FTC was required – and failed – to prove that the infomercials were actually false. However, that argument is at odds with the cases cited above. Indeed, the Defendants cannot point to any source adequate to disrupt the FTC's and district court's firm grounding in case law.[6]

---

[6] The Defendants do cite to a footnote in FTC v. Enforma Natural Products, Inc., 362 F.3d 1204 (9th Cir. 2004), for the proposition

-12-

Instead, the Defendants cite haphazardly to a federal statute (the Dietary Supplement Health and Education Act of 1994, Pub. L. No. 103-417, 108 Stat. 4325), whose legal relevance (if any) the Defendants never explain, and to a smattering of First Amendment case law, without engaging in any application of those sources or attempting to produce so much as a rough sketch of a rule that might support their proposition. We can make neither heads nor tails of these citations, which have no clear relevance and which are completely devoid of context or developed argument. We therefore hold that the Defendants have waived any argument they might have raised under those sources, if any exists. See, e.g., United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

---

that the FTC must prove actual falsity. Id. at 1217 n.14. However, the Ninth Circuit's footnoted aside is grounded in the earlier case FTC v. Pantron I Corp., 33 F.3d 1088 (9th Cir. 1994), in which the court recognized that the FTC had abandoned a reasonable basis claim and was expressly proceeding on a theory of actual falsity. See 33 F.3d at 1096 ("discuss[ing] only the falsity theory" because "the F.T.C. clearly and expressly abandoned the reasonable basis theory"). Thus, Pantron recognized the distinction between a reasonable basis approach – the approach the FTC favors here – and a falsity approach. See id. And, contra the bald assertion in Enforma, the Pantron court stated plainly that "a false advertisement need not even be false; it need only be misleading in a material respect." 33 F.3d at 1099 (internal quotation marks omitted). Thus, the statement in Enforma on which the Defendants rely is not only dicta, but also incorrect.

-13-

In light of the Defendants' failure to raise any principled objection to the "reasonable basis" framework, which was carefully applied by the district court, the remainder of our analysis will follow that framework.

## B. The Defendants produced no actual substantiation for their health claims.

We must now consider the application of the <u>Removatron</u> "reasonable basis" test to the record on summary judgment. To recap, under this test (and applying the summary judgment standard), we must determine whether there was uncontroverted evidence regarding: (1) what sort of evidence would scientifically establish the claims the Defendants made in their infomercials; and (2) whether the Defendants were actually possessed of such evidence. <u>See Removatron</u>, 884 F.2d at 1498. It is uncontested that the Defendants asserted the following claims in their infomercials: (1) coral-derived calcium supplements cure cancer, multiple sclerosis, and other degenerative diseases by rendering acidic bodies more alkaline, and they are 100% absorbed by the human body; and (2) Supreme Greens cure cancer and cause weight loss by rendering acidic bodies more alkaline. If these claims are not supported by sufficient scientific evidence, then liability follows. The Defendants claim that there are issues of fact on both prongs as applied to both infomercials.

-14-

On the first prong, the FTC produced four expert declarations which demonstrated that the claims could be substantiated by double-blind, placebo-controlled human studies. Specifically, Dr. Richard Wood averred that "[i]t is generally accepted that human studies are required to support a scientific finding concerning the bioavailability of a test compound in the human body." Dr. Maryfran Sowers provided specific examples of the scientific standards for, e.g., a chemical compound's effect on heart health: "It is generally accepted among scientists that for a test compound or product to be considered as having a clinically meaningful effect on blood pressure, the changes in blood pressure caused by the compound or test must reach certain established thresholds," which she then described in numerical detail. Dr. Sowers outlined other contours of reliability, noting that prospective studies of 50,000 and 90,000 subjects were "considered very reliable because of the large cohort involved and the breadth of information collected," whereas "the early data collected in a longitudinal study is scientifically suspect until adequate temporal distance is established between when the calcium intake data was collected and the time when new or incident blood pressure could develop." Dr. Landon King averred that "[i]n order to evaluate whether an intervention compound . . . changed the pH balance of the body, researchers would develop a protocol for a

-15-

controlled clinical trial that would measure the subjects' pH balance prior to receiving the test compound (or placebo) and at an appropriate period(s) after receiving either the test compound or a placebo." Dr. King noted specifically that "[i]n order to claim that a product increases alkalinity, reasonable scientists would expect the product to have been subject to such an appropriate clinical study." Dr. Barrie Cassileth averred that "[t]he most scientifically valid way to determine whether Supreme Greens (or any other product) produces any results is a double-blind, placebo controlled study."

To be sure, there may be other scientific evidence that could be sufficient, and we may assume for these purposes that a double-blind study is not necessarily required. But the government established that some scientific evidence is required for substantiation, and thus satisfied the first prong of the Removatron test. Because the FTC produced affidavits which are more than adequate on their face to satisfy the first prong of a "reasonable basis" claim, and because the Defendants neither produced nor pointed to any evidence to raise even the tiniest of fact issues, summary judgment was appropriate on the first prong.

On the second prong, the FTC relied on the same four expert declarations, in which the experts compared the Defendants' evidence to the available literature and concluded in each case

-16-

that the Defendants' evidence was woefully inadequate. The experts specifically opined that: (1) there was some evidence that calcium might help to prevent colorectal cancer but no evidence that calcium cures cancer; (2) there was some evidence that calcium might lower blood pressure but none that it cures heart disease; (3) there was no evidence whatsoever that calcium has any effect on autoimmune disorders; (4) there has been no research published in the Journal of the American Medical Association or the New England Journal of Medicine indicating that calcium "reverses" cancer; (5) there is no evidence that any kind of calcium is 100% absorbed; (6) there is no evidence that any disease is caused by "an overly acidic body"; (7) there is no evidence that alkalinity cures cancer or heart disease; (8) there is no evidence that any ingredient of Supreme Greens can prevent, treat, or cure cancer, heart disease, or diabetes; and (9) there is no evidence that Supreme Greens may cause weight loss.

The record contains a slew of other documents, including excerpts from Barefoot's books, excerpts from Barefoot's deposition testimony, excerpts from Guerrero's deposition testimony, a number of popular science and pseudoscientific articles, and one preliminary study. The Defendants claim that this evidence provided them with a reasonable basis for accepting the infomercials' claims as true. However, it is clear that none of

-17-

this material comes close to establishing an issue of fact regarding the Defendants' woefully inadequate substantiation evidence.

Barefoot's books present jumbles of quotes from scientists, scientific review articles, and scientific studies interspersed with references to Reader's Digest and other general-consumption reductions of these studies. His sources support such uncontroversial propositions as "[t]he connection between the electrical activity of the cell and the release of the neurotransmitter is not direct; <u>an essential intermediary is the calcium ion.</u>" Robert R. Barefoot & Carl J. Reich, <u>The Calcium Factor</u> (2000) (internal citation removed) (emphasis Barefoot's). However, none of these scientists or studies supports the panacean claims made in the Coral Calcium infomercial; the claims are extrapolations, distortions, and sometimes, seemingly, utter fabrications. It appears to be no accident that neither Barefoot, nor any Defendant, nor any of the Defendants' attorneys has at any point in these proceedings identified any particular scientific study or studies to support the specific claims presented in the Coral Calcium infomercial. Indeed, Barefoot's deposition testimony primarily relies on appeals to generic authority; his standard rhetorical practice is to assert that there are myriad studies that

-18-

support a given claim, without identifying any specifically.[7]  When

pressed for specificity, he generally refers the questioner to his

books.[8]  Nowhere in the record is there any support for, e.g., the

following propositions:  all diseases are caused by acidosis;

calcium supplements cure cancer; calcium supplements cure multiple

sclerosis; or coral-derived calcium is 100% absorbed into the body.

Guerrero's testimony is even less compelling, given that

he relies primarily on his own general experience as an alternative

medicine practitioner, without reference to any studies at all.

The Defendants make much of a double-blind, controlled, but also

unpublished and preliminary study, which they assert supports the

health claims advanced in the Supreme Greens infomercial; however,

the study found, based on a sample size of sixteen people, that one

of the ingredients in Supreme Greens – Methyl-Sulfonyl-Methane, or

---

[7] For example, Barefoot claims that he "hired the No. 1 scientist
in America . . . and he did a peer-review study all over the world
and came up with thousands and thousands of references"; and that
"I could load you up where it would take you ten years to get out
of this building before you read all the people that say calcium
prevents cancer"; and that "[t]ens of thousands of scientists are
saying that [calcium prevents cancer], and I can show you the
documents."

[8] For example, when asked about the public availability of these
uncountable studies, Barefoot said "I have just finished a book
called Let's Cure Humanity, in which I give you 1,000 scientific
references.  You're asking for them.  I'm giving them to you.  I
will also give you 100 scientific quotations from the world's best
scientists, and the quotations are startling: reverses PMS, it
reverses cancer; that it reverses diabetes . . . ."

MSM – might relieve arthritis pain and was therefore worthy of further study. This study on its face is grossly insufficient to support the Defendants' claims of Supreme Greens' efficacy in treating all diseases. And even the abstracts and excerpts from pseudoscientific articles, published in journals such as the non-peer reviewed and now-defunct Healthy & Natural Journal and Natural Way for Better Health, do not support the specific claims made in either infomercial — e.g., there is no support for the claims that the product Supreme Greens or any of their ingredients cure cancer, cure heart disease, or cause weight loss by alkalizing the body and thereby curing its need for fat as a protection against acid.

Given the complete absence of support for the vast majority of the Defendants' health claims – which absence the FTC's four experts also testified to on the basis of their own literature reviews – we easily could conclude that the Defendants lacked adequate substantiation under even the most lax standard of scientific reliability. Here, however, the FTC produced evidence establishing a rigorous standard of scientific reliability, and the record reveals that the Defendants fell well and unquestionably short of this standard. In all, the strong evidence establishing a scientific standard for evaluating the Defendants' advertising claims, the overwhelming evidence supporting the Defendants' lack

-20-

of substantiation evidence, and the failure of the Defendants to
indicate any evidence to raise an issue of fact on either point,
compel the legal conclusion that the Defendants lacked a reasonable
basis for the health claims they used to sell their products. Cf.
Removatron, 884 F.2d at 1498. The Defendants therefore engaged in
deceptive advertising as a matter of law. See id.

## C. The Defendants made specific health claims which were not cured by general disclaimers.

The Defendants attempt to head off the above analysis by
asserting that their infomercials advanced no actual health claims
but, instead, presented only puffery which was further attenuated
by the presence of general disclaimers. Where a claim is merely
"exaggerated advertising, blustering, and boasting upon which no
reasonable buyer would rely," it may be un-actionable puffery. See
Clorox Co. Puerto Rico v. Proctor & Gamble Comm. Co., 228 F.3d 24,
38 (1st Cir. 2000) (quotation marks omitted). However, "specific
and measurable" claims and claims that may be literally true or
false are not puffery, and may be the subject of deceptive
advertising claims. Id. (quotation marks omitted). As set forth
above, passim, the Defendants' infomercials presented specific and
measurable health claims. These claims included definite
statements that coral calcium cures cancer, autoimmune diseases,
and pain by rendering acidic bodies more alkaline, as well as

-21-

statements that Supreme Greens cure cancer, heart disease, and cause weight loss by rendering acidic bodies more alkaline. Due to their specificity and concreteness, such claims go far beyond puffery as a matter of law. See id. at 39.

The presence of disclaimers does not provide any more assistance to the Defendants. This court has held that "[d]isclaimers or qualifications in any particular ad are not adequate to avoid liability unless they are sufficiently prominent and unambiguous to change the apparent meaning of the claims and to leave an accurate impression. Anything less is only likely to cause confusion by creating contradictory double meanings." Removatron, 884 F.2d at 1497. The disclaimers at issue here did nothing to affect the meaning of the infomercials' health claims and were not even sufficient to cause confusion, given the clarity and concreteness of the claims. The infomercial transcripts reveal only disclaimers that the infomercials are paid advertising. The Defendants have presented no concrete evidence of any other attenuating messages.[9] In contrast, the health claims were bold

---

[9] The Defendants' brief claims that the infomercials contained "disclaimers that stated the shows . . . expressed the opinions of the speakers, and that the products were not intended to diagnose, treat or cure any disease." The brief contains no record cites, and the only relevant evidence below (not included in the appendix but pointed out at oral argument) is an affidavit from Luke Goljian, who testified that one version of the Supreme Greens infomercial - the ninth edit, which was "sent out on several

and straightforward, presented by supposed experts as testable observations backed up by clinical trials and studies. Given the Defendants' lack of substantiation for these concrete claims framed by do-nothing disclaimers, we affirm the district court's grant of summary judgment on the issue of the Defendants' liability for deceptive advertising.

## D. Maihos is individually liable as an owner and corporate officer who lacked appropriate substantiation.

The Defendants present one last argument on liability, arguing that the district court erred in holding Maihos individually liable. Individual liability for deceptive advertising is appropriate where an individual (1) was a corporate officer with the capacity to make decisions regarding the challenged conduct, and (2) knew or should have known that there was no reasonable basis for the deceptive claims. See, e.g., FTC v. Publishing Clearing House, Inc., 104 F.3d 1168, 1170 (9th Cir.

---

occasions to stations" during an indeterminate time frame – did include disclaimers fitting the description in the brief. But even assuming that these disclaimers actually accompanied either of the challenged infomercials – despite the absence of any concrete support for that proposition in the record – such disclaimers would not leave an accurate impression but instead would only cause confusion. Cf. Removatron, 884 F.2d at 1497. A statement that studies prove a product cures a certain disease, followed by a disclaimer that the statement is opinion and the product actually does not cure the disease, leaves an overall impression of nonsense, not clarity.

1997). The FTC produced ample support for each proposition, and the Defendants produced no evidence to the contrary.

The FTC produced evidence that Maihos was a 50% owner of DMC and ITV, that he controlled both companies' purse strings and day-to-day operations, and that he was the contact for an attorney retained to review the infomercials for their legality under federal trade law.[10] Maihos (ignoring his status as an officer and half-owner of DMC) focuses on gaps in his responsibilities, relying on, e.g., his testimony that he did not edit the content of advertising. This is simply irrelevant. The question is whether he could have nipped the offending infomercials in the bud; the FTC produced evidence that he could, and he has produced no evidence —

---

[10] Maihos also seeks to rely on two district court cases, both of which found straw officers and owners not individually liable. See FTC v. QT, Inc., 448 F. Supp. 2d 908, 973 (N.D.Ill. 2006) (corporate officer who "had no involvement in the actions that led to corporate liability" and "has no set position and provides help around the office" not liable); United States v. Building Inspector of America, Inc., 894 F. Supp. 507, 519-20 (D.Mass. 1995) (finding liability where "founder and president['s]" claim of no involvement was "entirely implausible"; finding issue of fact as to liability for vice president with no evidence of actual authority or direct involvement; and finding no liability for treasurer with no evidence of any authority or any involvement). Building Inspector recognizes individual liability for a "founder and president." See 894 F. Supp. at 519. In addition to being a founder, Maihos was the founding president of DMC. Maihos's extensive duties, involvement, and ownership interest in the corporate Defendants bring him entirely outside the ambit of these non-controlling cases to the extent they find no liability for corporate officers. Cf. id.

-24-

even his own testimony — to indicate that he couldn't. See FTC v. Freecom Comm., Inc., 401 F.3d 1192, 1205 (10th Cir. 2005) (finding individual liability where "[e]verybody knew that [the defendant] was the principal shareholder of the company and his opinions and advice and direction were listened to very carefully and were generally followed or heeded").

On the second prong, Maihos's knowledge, the FTC produced Maihos's own deposition testimony admitting that DMC did not have any substantiation for the claims made in either infomercial. Maihos also testified about an email he received from his then-girlfriend, a registered dietitian. The email provides both direct and circumstantial evidence of Maihos's knowledge. The email is direct evidence that the girlfriend informed Maihos that "[c]alcium from anything cannot be 100 percent bioavailable" and that "[t]here's no evidence at all that Coral Calcium is better than ordinary calcium or has any special health-boosting properties." The girlfriend also asked Maihos, "do you think there is a product ([over the counter] no less) that can prevent heart disease, diabetes, arthritis AND cancer?" Maihos testified that he dismissed the email as mere skepticism. However, the email is also circumstantial evidence that Maihos actually requested the information from the girlfriend, who consulted third parties on Maihos's behalf. The email begins, "Hello, as requested here are

-25-

the responses I got." It also attached an email from the address Wic-talk@NAL.USDA.GOV, which a quick internet search reveals is an electronic discussion group promoted by the United States Department of Agriculture "for use by individuals involved in providing nutrition services." See WIC-Talk, http://www.nal.usda.gov/wicworks/Talk/index.html (last visited Oct. 19, 2010). Thus, the imputed exchange giving rise to the girlfriend's email implies that Maihos himself questioned the infomercials' claims. The FTC also produced evidence that Maihos had attended DMC meetings regarding the production of "clean" and "re-edited" versions of the infomercials while earlier versions of the infomercials still ran. Finally, the FTC produced evidence that an attorney suggested to Maihos in October 2003, well before the Defendants pulled the Supreme Greens infomercial off the air,[11] that the Supreme Greens infomercial required voluminous support and advanced "BS" claims.

Again, the Defendants point to nothing that might challenge any of this evidence, relying instead on Maihos's protestations that he sincerely believed in the infomercials'

---

[11] For example, there is evidence in the record that Donald Barrett sent an email to "All Managers" on February 23, 2004, stating that "[w]e should now be using the original version Supreme Greens" and that a new version would "be testing in April or the beginning of next qtr."

-26-

health claims. It is true that two district court cases support the proposition that sincere belief may be an element in the individual liability calculus; however, even sincere belief is not sufficient here to overcome the overwhelming evidence that Maihos knew or, at the very least, should have known that the infomercials lacked any reasonable basis in scientific fact. See FTC v. Medical Billers Network, Inc., 543 F. Supp. 2d 283, 320-22 (S.D.N.Y. 2008) (finding individual liability); FTC v. Patriot Alcohol Testers, Inc., 798 F. Supp. 851, 860 n.3 (D.Mass. 1992). This is particularly so given that the patent ridiculousness of the infomercials' health claims was presented multiple times by multiple people to Maihos, who chose to remain willfully blind. Thus, there is no question that Maihos knew that the infomercials' claims lacked substantiation, that he had the authority to control DMC and ITV, and, nevertheless, that he did little or nothing. The district court did not err in holding Maihos individually liable for deceptive advertising, and we affirm.

## E. Gross receipts are an appropriate basis for calculating damages.

Turning now to the issue of damages, the Defendants begin by arguing that damages for deceptive advertising are limited to actual profits, not gross receipts. If this were so, then at least part of the district court's damages award would be erroneous. However, the law allows for broad discretion in fashioning a remedy

for deceptive advertising; many cases uphold rescission (effectively, restoring the parties to pre-sale status) or restitution (under these facts, the same) as appropriate remedies. See Trudeau, 579 F.3d at 771 (noting that "[c]onsumer loss is a common measure for civil sanctions in contempt proceedings and direct FTC actions" and listing cases). Thus, consumer loss, as represented by the Defendants' gross receipts, would appear to be an appropriate measure of damages.

Nevertheless, the Defendants ask us to rely on FTC v. Verity Int'l, Ltd., 443 F.3d 48 (2d Cir. 2006), for the proposition that the FTC's remedy is limited to the Defendants' profits rather than their gross receipts. Verity's limited rule does not apply here.

In Verity, a series of unrelated, non-party middlemen partook of the proceeds from the defendants' scheme before the defendants themselves got a bite. See 443 F.3d at 53 (describing the relationship as a "multitiered, cascading-payment structure"). The court found this payment structure highly relevant to the issue of damages, noting that "in many cases in which the FTC seeks restitution, the defendant's gain will be equal to the consumer's loss" but casting Verity's facts as an exception limited to the situation "when some middleman not party to the lawsuit takes some of the consumer's money before it reaches a defendant's hands."

-28-

Id. at 68 (emphasis added); see also Trudeau, 579 F.3d at 772 (describing Verity as holding only that "certain circumstances require courts to limit disgorgement to the defendant's profits"). Here, the Defendants seek to inflate Verity's exception so that it overshadows the rule.

We are not persuaded. Because this set of facts lacks the non-party middleman that gave rise to the exception in Verity, we will follow the general rule. Here, the Defendants on appeal took in proceeds directly, except for roughly one year when fellow defendant (but non-appellant) Triad processed Coral Calcium orders. The FTC introduced ample evidence of the overall proceeds from Coral Calcium during this period; however, the parties' financial records were in such disarray that the actual split among the parties could not be determined.[12] The Defendants on appeal now claim that Triad siphoned off the vast majority of the proceeds, leaving them holding an empty bag, but we cannot tell whether this is the case. Because every entity that had received consumer money was a defendant, the district court held that gross receipts were an appropriate measure of damages; because records were unclear as to how much consumer money each defendant received, the district

---

[12] The FTC perhaps ought to have made more of an effort to nail down the details of the parties' finances during discovery, as we also note infra at 37-38, but there is no question that the primary fault lies with the Defendants.

-29-

court evenly split the total receipts between DMC and Triad for the time period when Triad acted as a middleman. This was consistent with Verity and within the bounds of the district court's discretion in fashioning an equitable remedy. See Freecom, 401 F.3d at 1202 n.6 (noting that the FTC Act's "grant of authority to provide injunctive relief carries with it the full range of equitable remedies, including the power to grant consumer redress").

Thus, the district court committed no error in resting its damages determination on the Defendants' gross receipts rather than their net profits, and we will proceed to review the court's calculation of what those gross receipts actually were. To determine the appropriate amount of damages in deceptive advertising cases, courts apply a burden-shifting scheme. First, the FTC must provide the court with a reasonable approximation of damages.[13] See FTC v. Febre, 128 F.3d 530, 535 (7th Cir. 1997). Both gross receipts and net customer loss are appropriate measures. See id.; Freecom, 401 F.3d at 1206. Once a reasonable

---

[13] The Defendants argue that the district court did not hold the FTC to its initial burden of proving a reasonable approximation of damages, and therefore that the court engaged in premature burden shifting by relying on the Defendants' disheveled records as proffered by the FTC. This argument has no merit, as we uphold in each instance the evidentiary basis for the damages award and find that the FTC presented sufficient evidence to demonstrate a reasonable approximation of damages.

-30-

approximation of damages has been provided, the defendant has an opportunity to demonstrate that the figures are inaccurate. <u>See</u> <u>Febre</u>, 128 F.3d at 535. Any fuzzy figures due to a defendant's uncertain bookkeeping cannot carry a defendant's burden to show inaccuracy. <u>See id.</u> The district court and all parties find a rare point of agreement in the notion that this exercise may be broken down into three constituent time periods – January 2002 to February 2003, March 2003 to July 2003, and August 2003 to June 2004 – each of which we will address in turn.

## F. The district court's determination of damages from January 2002 to February 2003 was not erroneous.

The Defendants first challenge the propriety of the damages award for sales of Coral Calcium from January 2002 to February 2003, during which time DMC and fellow defendant (but non-appellant) Triad cooperated to sell Coral Calcium. The FTC introduced Exhibit 185 to support a finding that these defendants collectively received $40.9 million from sales of Coral Calcium from January 2002 to February 2003. A witness – Steven Ritchey, Triad's vice president in charge of accounting – testified that gross receipts from this time period were $40.9 million. Even Defendant Barrett testified that gross receipts from this time period were around $40 million. The district court credited all of the above, found that gross receipts were $40.9 million, found that

-31-

the records were unclear on the exact division of proceeds between DMC and Triad, and therefore judiciously split the award in two. This was all well within the court's discretion, and the Defendants do not raise any serious argument to the contrary.

The Defendants do challenge Exhibit 185 as improperly admitted. Although there is adequate evidence to support the district court's determination even absent Exhibit 185, we will briefly explain why that exhibit's admission was appropriate. Fed. R. Evid. 803(6) provides that business records may be admissible if certified according to Fed. R. Evid. 902(11). Rule 902(11) provides that "a duplicate of a domestic record of regularly conducted activity" is admissible "if accompanied by a written declaration of its custodian or other qualified person." This declaration must establish that the document:

> (A) was made at or near the time of the occurrence of the matters set forth by, or from information transmitted by, a person with knowledge of those matters; (B) was kept in the course of the regularly conducted activity; and (C) was made by the regularly conducted activity as a regular practice.

Fed. R. Evid. 902(11).

The Defendants do not and cannot dispute that a declaration from Ilesh Sanghavi, who worked for Triad as an accountant, touched each of these elements, providing a solid basis

-32-

in the record supporting the district court's decision.[14]  Instead,
the Defendants take issue with the FTC's declarant's wording (use
of "believe" and failure to use the magic words "regular course of
business"), the format of the exhibit (arguing that CDs are not
produced in the regular course of business), and their own
speculation that the exhibit might include third party data.  None
of these arguments provides any reason that we can discern to
override the district court's exercise of discretion; the only one
that might have any legal basis is the third party data argument,
which nevertheless fails.[15]  Similarly, the Defendants protest the
FTC's relatively late submission of the authenticating affidavit
without actually suggesting that they have suffered any prejudice

---

[14] Specifically, the declaration identifies the documents as
spreadsheets containing Triad's financial data and further
provides: (A) that from June 2000 to July 2005, the declarant
entered Triad's financial data into spreadsheets, maintained
Triad's accounting records, and oversaw all of Triad's employees
who did any accounting work; (B) that the declarant and Triad kept
and regularly relied on these spreadsheets and the data they
contained; and (C) that the data were entered into the spreadsheets
almost daily.

[15] Although some circuits have extended the business records
exception beyond its original formulation, see, e.g., United States
v. Adefehinti, 510 F.3d 319, 326 (D.C. Cir. 2007) (explaining that
"a record of which a firm takes custody is . . . 'made' by the firm
within the meaning of the rule . . . and thus is admissible if all
the other requirements are satisfied" and listing cases to that
effect), we need not reach that question.  The records at issue
here were so intimately integrated into Triad and the Defendants'
own records that they were reliable enough to be admissible without
the need to consider any such extension.

or otherwise indicating that their protestations would support reversal or remand. Again, we are reminded of and apply the principle that insufficiently developed arguments are waived. Zannino, 895 F.2d at 17.

The Defendants also argue that they met their burden of demonstrating the inaccuracy of the FTC's figures by arguing that DMC and Triad split only the proceeds from Coral Calcium sales, not the gross receipts; however, they point to no hard evidence to support this assertion, nor do they present any counter to the argument that they could have been held liable for the whole $40.9 million under joint and several liability. How to weigh the evidence is a question of fact on which we must defer to the district court. And, in the end, the district court had plenty of good reasons for its determination of damages from January 2002 to February 2003, the Defendants have presented no good reasons to upset that determination,[16] and we need go no further in order to affirm.

---

[16] Least of all the Defendants' argument based on their own sloppy record-keeping, which we have not yet bothered to mention: "Thus, there is no way to distinguish the amount of sales for the Coral Calcium product that was being sold through the Coral Calcium infomercial." We reiterate that uncertain financial records are not sufficient to demonstrate that the FTC's reasonable estimate is inaccurate. See Febre, 128 F.3d at 535.

-34-

**G. The district court's determination of damages from March 2003 to July 2003 was not erroneous.**

The Defendants next challenge the damages award for sales of Coral Calcium from March 2003 to July 2003, at which point Triad was out of the picture and the Defendants on appeal acted in concert with one another exclusively. The only argument the Defendants can muster on this front is another challenge to the authentication of a set of business records admitted as Exhibits 187 and 209. These records are the products of DMC spreadsheets that show $13.1 million in sales of Coral Calcium from March 2003 to July 2003. These records were authenticated by live testimony, so only Fed. R. Evid. 803(6) and not Fed. R. Evid. 902(11) applies. To be admissible, a record must have been

> made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record or data compilation, all as shown by the testimony of the custodian or other qualified witness . . . .

Fed. R. Evid. 803(6).

Again, the Defendants do not and cannot dispute that an affidavit – this one from Karen Gorewitz, a DMC employee – touched each element of proper authentication, providing a solid basis in

-35-

the record supporting the district court's decision.[17] Instead, the Defendants generically attack Gorewitz's witness-stand testimony regarding the content of the affidavit, arguing that her lack of certainty on peripheral issues – e.g., she did not know much about the "Value" column in the spreadsheets, or whether DMC kept the records in any particular form – somehow undermines the documents' authenticity. As is frequently the case throughout their brief, the Defendants fail to tie their general attacks into any sort of legal theory, conducting no analysis but citing to Fed. R. Evid. 803(6) and 902(11) without comment. Even assuming that they might have raised a valid legal argument (although again we find ourselves reminded of the rule that inadequately briefed issues are waived, see Zannino, 895 F.2d at 17), their attack – concerning the style more than the substance of the witness's testimony – presents the sort of second-guessing, cold-record inquiry that cautions deference to the district court. See United States v. Freeman, 208 F.3d 332, 339 (1st Cir. 2000). Accordingly, we affirm.

---

[17] Specifically, Gorewitz testified that the records showed information entered by DMC-employed telemarketers while they were on the phone with customers. She further testified that she regularly produced reports of the sort introduced into evidence and relied on the data from the databases as presented in the report format. Gorewitz's firsthand observation of realtime data entry and regular reliance on reports in the same format and from the same data as the exhibits are sufficient to meet the criteria of Rule 803(6).

**H. The district court's determination of damages from August 2003 to June 2004 was not erroneous.**

Finally, the Defendants challenge the damages award for sales of Supreme Greens from August 2003 to June 2004. They essentially argue that the FTC did not meet its initial burden of demonstrating a reasonable approximation of damages. This is so, they argue, because the Defendants' own records were in such disarray that the FTC could not draw a connection from the Supreme Greens receipts to the particular version of the Supreme Greens infomercial that the FTC proved to be deceptive. Purportedly, numerous other versions of the Supreme Greens infomercial existed and were aired at various times and places, although no one knows which version was aired at what time in any given place.

The district court has discretion to determine a reasonable approximation of damages, and unclear financial records cannot carry a defendant's burden of demonstrating that such a reasonable approximation is inaccurate. See Febre, 128 F.3d at 535. Here, the Defendants could not or would not produce an accounting that suggested even a rough approximation of what percentage of their Supreme Greens proceeds were based on the offending infomercial. Instead, in response to an interrogatory, they represented to the FTC that their records were subject to "substantial confusion" and that "it is impossible to determine

-37-

what sales are attributable to any specific version of the Supreme
Greens infomercial." At this point, the FTC perhaps should have
filed a motion to compel, given its apparent ability to produce
order from chaos in this case. Instead, it allowed the records
regarding which version of the Supreme Greens infomercial aired
where and when to remain in disarray. This was the one hitch in an
otherwise well-conducted case, but it is not enough to overcome the
fact that, in the end, it is DMC's record-keeping that caused the
uncertainty. And this hitch certainly does not establish the sort
of clear error required to upset the district court's careful and
considered ruling. Thus, the district court was within its
discretion to estimate damages broadly based on the accounting
information available to it, and the defendants produced nothing to
overcome such an estimate. See Freecom, 401 F.3d at 1206-07. We
affirm.

### III. CONCLUSION

On a well-developed record that reveals no significant
factual disputes, the district court correctly granted summary
judgment to the FTC on the issue of the Defendants' liability for
deceptive advertising. On an equally well-developed record after
a bench trial on damages, the district court correctly applied its
equitable authority to fashion an appropriate remedy, ordering the
Defendants to cure their customers in a way that their bogus

-38-

supplements could not.[18]  Accordingly, we **affirm** the district court

in all respects.

.

_____

[18] The Defendants argue that the district court erred in imposing
liability against BP.  They present this argument as a footnoted
afterthought (see D. Br. 44 n.12); the FTC likewise responds to
this argument in a footnote (see FTC Br. 52 n.22).  We continue the
trend and harken one more time to Zannino, 895 F.2d at 17.  See
also Nat'l Foreign Trade Council v. Natsios, 181 F.3d 38, 60 n.17
(1st Cir. 1999) ("We have repeatedly held that arguments raised
only in a footnote or in a perfunctory manner are waived.").

# EXHIBIT D

## Daniel Hurtado

| | |
|---|---|
| **From:** | Daniel Hurtado [dhurtado2@att.net] |
| **Sent:** | Tuesday, October 26, 2010 6:48 PM |
| **To:** | 'info@consumeraffairs.com' |
| **Subject:** | Kevin Trudeau |
| **Attachments:** | Letter to Consumer Affairs.doc |

Please forward the attached immediately to Mr. James R. Hood and Mr. Mark Huffman.

Thank you.

Daniel Hurtado
Attorney for Kevin Trudeau

**Daniel J. Hurtado**
Attorney at Law
841 North Grove Avenue
Oak Park, Illinois 60302
(708) 289- 2503
Dhurtado2@att.net

October 26, 2010

**BY FACSIMILE TO 800-779-0816**

ConsumerAffairs.com, Inc.
Legal Department/Management

> **Re:  Kevin Trudeau**

Dear Madam/Sir:

I am legal counsel to Kevin Trudeau.  The article that ConsumerAffairs.com has published today entitled "Kevin Trudeau Loses Appeal of $54 Million Judgment" is incorrect and we ask that you publish a retraction immediately.  The article discusses the results of a case to which Mr. Trudeau is not a party.  The case, *FTC v. Direct Marketing Concepts, Inc. et al.,* Case No. 09-2172, names as parties Direct Marketing Concepts, Inc., ITV Direct, Inc., Donald W. Barrett, Robert A. Maihos, and BP International, Inc.

In addition, Mr. Trudeau is not awaiting sentencing in any matter.

We request that you immediately retract both of the incorrect statements outlined above.  I look forward to your immediate response.

Sincerely,

*Daniel J. Hurtado*

Daniel J. Hurtado
Counsel to Kevin Trudeau

# EXHIBIT E

**Daniel Hurtado**

| | |
|---|---|
| **From:** | Daniel Hurtado [dhurtado2@att.net] |
| **Sent:** | Wednesday, October 27, 2010 3:44 PM |
| **To:** | 'info@consumeraffairs.com' |
| **Subject:** | Kevin Trudeau |
| **Attachments:** | Letter to James Hood.doc |

Please forward the attached letter to Mr. James Hood. The letter is also being delivered by Federal Express.

Thank you,

Daniel Hurtado
Counsel to Kevin Trudeau

Daniel J. Hurtado
Attorney at Law
841 North Grove Avenue
Oak Park, Illinois 60302
(708) 289- 2503
Dhurtado2@att.net

October 27, 2010

**BY EMAIL AND FEDERAL EXPRESS**

ConsumerAffairs.com, Inc.
Attn: James R. Hood
11400 West Olympic Boulevard
Suite 200
Los Angeles, CA 90064

Re:    Kevin Trudeau

Dear Mr. Hood:

This letter will follow up on the email letter I sent to you yesterday afternoon (October 26, 2010). I am legal counsel to Kevin Trudeau. The article that ConsumerAffairs.com published prominently on its website as of October 26, 2010, entitled "Kevin Trudeau Loses Appeal of $54 Million Judgment," and authored by Mark Huffman, is false and defamatory of Mr. Trudeau. Mr. Trudeau is not, and never has been, a party to the First Circuit Court of Appeals case that the article discusses. That case, *FTC v. Direct Marketing Concepts, Inc. et al.,* Case No. 09-2172, names as parties Direct Marketing Concepts, Inc., ITV Direct, Inc., Donald W. Barrett, Robert A. Maihos, and BP International, Inc. Neither Mr. Trudeau nor any company with which he is affiliated is a party to that case.

Accordingly, it is a false statement that "[a] federal appeals court upheld fines [against Trudeau] totaling millions of dollars[,]" or that "[t]he appeals court upheld a lower court's finding that [Trudeau] violated numerous consumer fraud laws." As noted, Mr. Trudeau has never been a party to that case, and thus neither the lower court nor the appeals court "fined" Mr. Trudeau or found him to be in violation of consumer fraud laws. In fact, no court has ever found Mr. Trudeau to be in violation of the FTC Act or any other consumer fraud laws.

In addition, it is a false statement that "Trudeau is also awaiting sentencing on a criminal contempt charge." Mr. Trudeau has no standing criminal conviction against him, much less is he "awaiting sentencing."

The statements outlined above are defamatory *per se.* It is evident that they were made with knowledge of their falsity, and, at minimum, with reckless disregard of their truth or falsity. Indeed, it is particularly perplexing, and outrageous, that an organization whose mission is the exposure of consumer fraud could so cavalierly defame Mr. Trudeau.

Mr. Trudeau demands that you publish a full retraction on the front page of the ConsumerAffairs.com website, with the same prominence and exposure as was afforded Mr. Huffman's defamatory article. Mr. Trudeau reserves the right to pursue all available legal remedies.

I look forward to your immediate response.

Very truly yours,

Daniel J. Hurtado
Counsel to Kevin Trudeau

# EXHIBIT F

## Daniel Hurtado

| | |
|---|---|
| **From:** | Daniel Hurtado [dhurtado2@att.net] |
| **Sent:** | Thursday, October 28, 2010 3:40 PM |
| **To:** | 'Cameron Stracher' |
| **Subject:** | RE: ConsumerAffairs |

Cameron-

I would like to follow up with you regarding timing. It appears that the lead-in, "What Kevin Trudeau Doesn't Want You to Know," remains on the front page of your client's website, and that the linked-to article, "Kevin Trudeau Loses Appeal Of $54 Million Judgment," also remains on the site. Both of those pieces are undisputably inaccurate. To avoid or mitigate further injury to Mr. Trudeau, we request that your client immediately remove both articles from its website, while you are investigating the matter and considering what additional remedial matters your client will undertake.

Thank you,

Dan Hurtado

**From:** Cameron Stracher [mailto:cam@stracherlaw.com]
**Sent:** Thursday, October 28, 2010 2:21 PM
**To:** dhurtado2@att.net
**Subject:** ConsumerAffairs

Good to speak with you just now. This is my email address. I look forward to receiving the information.

**Cameron Stracher**
One Park Avenue, 3rd Floor, NY, NY 10013
4 North Pasture Road, Westport, CT 06880

Phone: 212.743-6513 (NY); 203.222.7169 (CT & Fax)
Cell: 917.501.6202
cam@stracherlaw.com

# EXHIBIT G

CAMERON A. STRACHER, ESQ.
ONE PARK AVENUE, 3RD FLOOR
NEW YORK, NY 10016

(212) 743-6513

October 29, 2010

**By Email**

Daniel Hurtado, Esq.
841 North Grove Avenue
Oak Park, Illinois  60302

Re:    Kevin Trudeau

Dear Mr. Hurtado:

As you know, I represent ConsumerAffairs.com ("Consumer Affairs").  I write in response to your letter dated October 27, 2010, to James Hood, as well as your email to me on October 28.  Please be advised that Consumer Affairs disagrees that its article posted on October 26, 2010, entitled "Kevin Trudeau Loses Appeal of $54 Million Judgment" is defamatory (the "article").  Although Mr. Trudeau was not a named party in *FTC v. Direct Marketing Concepts, Inc.,* he was the spokesperson for the infomercials that were the subject of the legal proceeding.  As you may know, in any claim for defamation plaintiff bears the burden of proving that the statement he claims to be defamatory is not "substantially true." *See Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496 (1991); *Phila. Newspapers, Inc. v. Hepps*, 475 U.S. 767 (1986).  Plaintiff's burden of proving falsity is not satisfied "so long as 'the substance, the gist, the sting, of the libelous charge [is] justified.'" *Masson*, 501 U.S. at 517 (citation omitted).  "Put another way," an alleged defamation is "not considered false unless it 'would have a different effect on the mind of the reader from that which the pleaded truth would have produced.'"  *Id.* (quoting Robert D. Sack, *Libel, Slander and Related Problems* 138 (1980)); *see also Restatement (Second) of Torts* § 581A, cmt. f (1977) (doctrine of substantial truth does not require that evidence "establish the literal truth of the precise statement . . . provided that the defamatory charge is true in substance").  Here, the statements about which you complain would not have a different effect on the average reader than the literal truth.  Thus, none would be actionable in defamation.

Similarly, although you claim that "Mr. Trudeau has no standing criminal conviction against him, much less is he "awaiting sentencing," the District Court of the Northern District of Illinois requested the United States Attorney to prosecute Trudeau for criminal contempt, and the US Attorney has assigned two prosecutors to the case. *See FTC v. Trudeau*, 2010 WL 4134329, *2 (N.D. Ill. 2010).  Thus, pursuant to the above authorities, Consumer Affairs' statements were substantially true.

Daniel Hurtado, Esq.
October 29, 2010
Page 2

In addition, given Mr. Trudeau's history of entanglements with the FCC, as noted by the First Circuit in footnote 3 of its opinion in *Directing Marketing*, as well as the substantial fine levied against him in *Trudeau* and the pending criminal investigation, it would be difficult for Mr. Trudeau to establish any damages resulting independently from the statements you claim are false and defamatory in the article.

Nevertheless, in light of your correspondence and upon further review of the decision in *Direct Marketing*, Consumer Affairs has made several revisions to the article, including the headline.

I trust this addresses your concerns. Please let me know if you have any questions.

Very truly yours,

Cameron Stracher

cc: James Hood

# EXHIBIT H

**CONSUMERAFFAIRS.COM**

NEWS  RECALLS  COMPLAINT FORM  SCAM ALERTS  RESOURCES
Small Claims Guide  Class Actions  Lemon Laws  FAQ  Newsletters

🔲 SHARE  🔲 ✉ ✉

**COMPLAINT BUTTON**
Complain about a product or service

Automotive  Education  Employment  Electronics  Family  Finance  Health  Homeowners  Insurance  Pets  Shopping  Travel

🖨 Print This  ✉ Email This

Search

NEWS  Latest | Archives | Auto | Cells, etc. | Computers | Financial | Health | Homeowners | Parents | Privacy | Scams | Seniors | Travel

## Appeals Court Upholds FTC in Kevin Trudeau Case

Claims for Coral Calcium were not just 'exaggerated advertising,' court finds

**Mark Huffman**
ConsumerAffairs.com

*October 26, 2010*

A federal appeals court has sided with the Federal Trade Commission in a case involving Coral Calcium products hawked by infomercial king Kevin Trudeau, perhaps best known for his books with titles such as "Natural Cures They Don't Want You To Know About."

The First Circuit Court of Appeals ruled for the FTC, affirming a lower court ruling that companies for whom Trudeau acted as a spokesman had engaged in deceptive advertising, committed consumer fraud and violated an FTC order banning Trudeau from doing any further infomercials.

"The Defendants in this case made millions off infomercials shilling purported panaceas, products that they claimed cured literally every disease, from cancer to Parkinson's to obesity," the justices wrote.

"Having been ordered to restore these millions to the customers they deceived, the Defendants now raise a multitude of challenges to two decisions of the district court: first, the court's grant of summary judgment in favor of the plaintiff Federal Trade Commission (FTC), finding the Defendants liable for deceptive advertising; and second, the court's determination of damages after a bench trial on that issue. Despite the volume of the Defendants' arguments, we find no more substance in them than the district court found in their infomercials. We therefore affirm the district court in toto."

The defendants filing the appeal were Direct Marketing Concepts, Inc. (DMC), ITV Direct, Inc. (ITV), Donald Barrett, Robert Maihos, and BP International (BP). Barrett and Maihos co-own ITV and DMC, both Massachusetts corporations; generally, ITV produces infomercials, and DMC distributes the infomercials, answers calls, and processes orders. BP is a holding corporation to w----- ---rett eventually (and secretly) transferred some of DMC's a------ ----



- Kevin Trudeau-Inspired Weight Loss Web Site Launched
- Kevin Trudeau Banned from Infomercials--Again
- Kevin Trudeau's 'Natural Cures' Agrees to Missouri Refunds
- Kevin Trudeau Now Offering 'Debt Cures'
- Feds Sue Trudeau Marketers
- Feds Sue Infomercial Maestro Kevin Trudeau Again
- FTC: Dietary Supplements Don't Deliver
- Trudeau Sells Customer Names to Junk Mailers
- Judge Refuses to Gag Trudeau Critics
- Consumer Agency Trashes Trudeau's 'Natural Cures' Book
- Kevin Trudeau Banned from Infomercials
- Supreme Greens, Coral Calcium Daily Give FTC Indigestion
- Coral Calcium Promoters Face Federal Charges
- Coral Calcium Claims Debunked
- Consumer complaints about Trudeau
- Trudeau Defenders

If You Haven't Had a Ticket in the Last 3 Years, You Are Paying Too Much for Auto Insurance
Select Your Age:

| 25 | 38 | 51 | 64 |
| 26 | 39 | 52 | 65 |
| 27 | 40 | 53 | 66 |
| 28 | 41 | 54 | 67 |
| 29 | 42 | 55 | 68 |
| 30 | 43 | 56 | 69 |
| 31 | 44 | 57 | 70 |
| 32 | 45 | 58 | 71 |
| 33 | 46 | 59 | 72 |
| 34 | 47 | 60 | 73 |
| 35 | 48 | 61 | 74 |
| 36 | 49 | 62 | 75+ |
| 37 | 50 | 63 | |

Calculate New Payment

**CONSUMER NEWS**

- Americans Skeptical About Economy, Executives Still Worried About a Prolonged Recession
- For Some Retailers, Black Friday Starts Next Week
- Next 15 Years Could Be Brutal for Boomers Saving for Retirement
- Economic Hard Times Bring Lasting Changes to Consumer Behavior

Today Only! iPads Being Sold for $14.06

*Are People Going Back To School With Grants? See If You Qualify.*



**Click Your Age**

| 25 | 26 | 27 | 28 | 29 |
| 30 | 31 | 32 | 33 | 34 |
| 35 | 36 | 37 | 38 | 39 |
| 40 | 41 | 42 | 43 | 44 |
| 45 | 46 | 47 | 48 | 49 |
| 50 | 51 | 52 | 53 | 54 |
| 55 | 56 | 57 | 58 | 59 |
| 60 | 61 | 62 | 63 | 64 |
| 65 | 66 | 67 | 68 | 69 |
| 70 | 71 | 72 | 73 | 74 |

classesUSA

Coral Calcium

Beginning in late 2001, DMC, Barrett, and Mathos became involved in marketing the product Coral Calcium by producing and distributing an infomercial promoting that product. These defendants then processed calls and sold Coral Calcium to consumers.

The infomercial for Coral Calcium relied on the purported expertise of Robert Barefoot. In the infomercial, Barefoot asserted a number of claims regarding coral-derived calcium and its supposed biological and medical properties. Barefoot claimed that all diseases are caused by a condition called acidosis:

"Are you getting the minerals? And if you're not, you will become acidic and you will get one of the major diseases," the pitch went. "You can have heart disease, cancer, lupus, fibromyalgia, multiple sclerosis. Name the disease, they're all caused by acidosis."

Barefoot then claimed that calcium derived from Okinawan coral cures these diseases:

"[W]e've been studying the coral calcium and I can tell you there are tens of millions of people, millions of testimonials," he said in the infomercial. "I've had 1,000 people tell me how they've cured their cancer. I've witnessed people get out of wheelchairs with multiple sclerosis just by getting on the coral."

The court's ruling quoted from a portion of the infomercial:

Miracle cure

Trudeau (host): Pain, talk about pain. Read in your book if a person has pain, muscle pain, joint pain –

Barefoot: Yes, yes.

Trudeau: – they take calcium –

Barefoot: Yes.

Trudeau: – their body turns from acid to alkaline, pain goes away.

Barefoot: That's exactly –

Trudeau: Is that common?

Barefoot: Yes, yes, very common.

Barefoot went on to claim that coral-derived calcium is superior to other sources of calcium because it is 100 percent bioavailable, meaning that all coral-derived calcium that is ingested is also absorbed into the body. To bolster his claims, Barefoot claimed that unspecified articles from the Journal of the American Medical Association and the New England Journal of Medicine "said that calcium supplements reverse cancer . . . that's a quote."

'Blustering and boasting'

Rather than arguing that the claims were true, the defendants argued that the claims were merely "exaggerated advertising," blustering and boasting upon which no reasonable buyer would rely," an argument the appeals court rejected.

"[T]he Defendants' infomercials presented specific and measurable health claims. These claims included definite statements that coral calcium cures cancer, autoimmune diseases, and pain by rendering acidic bodies more alkaline, as well as statements that Supreme Greens cure cancer, heart disease, and cause weight loss," the court found. "Due to their specificity and concreteness, such claims go far beyond puffery as a matter of law."

The infomercial directed potential customers to call an 800 number, on the other end of which DMC-employed telemarketers would follow a script directing them to tell potential customers that the product Coral Calcium would be 100 percent absorbed by their bodies and would combat degenerative diseases by rendering an acidic body more alkaline.

• More News ...

**SAFETY RECALLS**

• Mitsubishi Recalls Endeavor to Fix Air Conditioning Problem
• Suzuki Recalls SX4 to Fix Rearview Mirror
• Nissan Recalls 2 Million Selected Nissan and Infiniti Models
• Dollar Tree Recalls Children's Halloween Lanterns
• John Deere Recalls Mowers With Foot-Lift Option
• More Recalls ...

**LATEST RATES**

| Savings | Mortgage | Auto | Insurance | Credit Cards |

**TOP COMPANY COMPLAINTS**

• Chase Mortgage
• Chase Credit Cards
• Bank of America
• University of Phoenix
• Lending Tree
• Quicken Loans
• eHarmony.com
• Samsung TV
• JK Harris
• Amerisave Mortgage
• People to People
• Maytag Washers
• Your Baby Can Read
• Classmates.com
• Capital One
• Nutrisystem
• Trugreen

**MOST-VIEWED PAGES**

• People to People: How Selective Is It?
• Do You Really Need An Anti-Virus Program?
• Buying a Home in Foreclosure: What You Need to Know
• Do Swimming Pools Cause Cancer?
• Foreclosure Process Short-Circuited by Mortgage Company's Short Cut
• Wal-Mart Offers No-Contract 'Post-Paid' Cell Phones

**NEW COMPLAINTS**

• New York University
• Target Credit Card
• Credit Restoration Service
• CompuCredit
• LendSelect Mortgage
• First Savings Mortgage
• GadgetTown.com
• Franklin Credit Management Corp
• Loanstar Title Loans



get the services you want for less.
AT&T U-VERSE • TV • INTERNET • DIGITAL HOME PHONE

ONLINE EXCLUSIVE!
$300 BACK
DVR INCLUDED,
PLUS 2 NON-DVR
RECEIVERS FOR
3 MONTHS
LEARN MORE

Today Only: iPads Being Sold for $14.05

Telemarketers were also directed to tell sick customers that they should take higher doses of Coral Calcium, up to three times the standard dose. During the relevant time period (from January 2002 to July 2003), the Coral Calcium infomercial generated $54,034,394.82 in sales, of which approximately $575,000 were transferred to Defendant BP.

In its ruling, the First Circuit found the lower courts ruled correctly in ordering Trudeau and the other defendants to turn over the gross receipts from the sale of the products.

"On a well-developed record that reveals no significant factual disputes, the district court correctly granted summary judgment to the FTC on the issue of the Defendants' liability for deceptive advertising," the justices wrote.

Read the Appeals Court's ruling



### Report Your Experience

If you've had a bad experience — or a good one — with a consumer product or service, we'd like to hear about it. All complaints are reviewed by class action attorneys and are considered for publication on our site. Knowledge is power! Help spread the word. File your consumer report now.

### Free Consumer Newsletters

**The Daily Consumer**
Afternoons M-F
Sign up now!

**Consumer News & Alerts**
Every Sunday
Sign up now!

   

### Find the Best Rates

| Savings | Mortgage | Auto | Insurance | Credit Cards |
|---|---|---|---|---|
| Loan type | | Rate | +/- | Last week |
| MMA | | 0.68% | ▼ | 0.68% |
| 8 month CD | | 0.66% | ▼ | 0.68% |
| 1 yr CD | | 0.97% | ▼ | 0.98% |
| 1 yr CD jumbo | | 1.01% | ▼ | 1.03% |
| 5 yr CD | | 2.07% | ▼ | 2.09% |
| Select product and compare rates: | | | | |
| 1-year CD [ ] Go | | | | PROVIDED BY Bankrate.com |

Back to the top |

Advertisement

 

get the services you want for less.
AT&T U-VERSE™ TV ▸ INTERNET ▸ DIGITAL HOME PHONE

ONLINE EXCLUSIVE
enter online today and get up to
$300 BACK
DVR INCLUDED; PLUS 2 NON-DVR RECEIVERS FOR 3 MONTHS

Today Only: iPads Being Sold for $14.06

· Ads by Google    LG LCD    LG KP500    LG Fridges    LG Dual Layer DVD R

# CONSUMERAFFAIRS.COM

**AUTOMOTIVE**
* Dealers
* Manufacturers
* Service
* Extended Warranties
* Lemon Laws
* Recalls
* Tires
* Towing
* Transporters

**DINING**
* Food Products
* Restaurants

**BUSINESS SERVICES**
* Services for Businesses
* Work at Home

**FAMILY**
* Aging
* Children, Parenting
* Recalls
* Dating
* Education
* Entertainment
* Modeling & Talent Agencies
* Pets
* Weddings

**FINANCE**
* Annuities
* Banks
* Credit Cards
* Debt Collection
* Debt Counseling
* Insurance
* Investing
* Loans
* Mortgages
* Payday Loans
* Student Loans
* Tax Prep

**HEALTH**
* Dentists
* Doctors
* Drugs, Pharmacies
* Health Clubs
* Hearing Care
* Hospitals
* Nursing Homes
* Nutrition, Diets
* Vision Care
* Weight Loss

**HOUSE & HOME**
* Appliances
* Cookware
* Furniture
* Home Improvements
* Lawn & Garden
* Movers
* Pools & Spas
* Realtors, Rental Agents
* Recalls
* Storage Services
* Utilities

**ELECTRONICS**
* Cable TV/DBS
* Cameras
* Cell Phones
* Computers
* Home Electronics
* Internet Access
* Local Phone Service
* Long Distance
* VoIP

**RECREATION**
* Boats
* Sporting Goods

**SHOPPING**
* Delivery Services
* In-Home
* Online
* Retail Stores
* Supermarkets
* Telemarketers

**TRAVEL**
* Airlines
* Bus Lines
* Car Rental
* Cruises
* Hotels
* Travel Agents
* Trains

**RESOURCES**
* Class Actions
* Complaint Form
* Small Claims Guide
* Lemon Laws

**CONSUMER NEWS**
* Latest News
* Automotive
* Telecom
* Financial
* Health
* Homeowners
* Scams
* Seniors
* Travel
* More ...

**RECALLS**
* Automotive
* Children's Products
* Drugs
* Food
* Household Products
* Sporting Goods

**ABOUT US**
* FAQ
* Privacy Policy
* Advertise With Us
* Newsroom
* Syndication
* Terms of Use

**Terms of Use** Your use of this site constitutes acceptance of the Terms of Use

**Advertisements** on this site are placed and controlled by outside advertising networks. ConsumerAffairs.com does not evaluate or endorse the products and services advertised. See the FAQ for more information.

**Company Response Welcome** If complaints about your company appear on our site, we welcome your response. Please see the Response Form for more information.

For more information, see the FAQ and privacy policy. The information on this Web site is general in nature and is not intended as a substitute for competent legal advice. ConsumerAffairs.com makes no representation as to the accuracy of the information herein provided and assumes no liability for any damages or loss arising from the use thereof.

**Copyright © 2010** ConsumerAffairs.com Inc. All Rights Reserved. The contents of this site may not be republished, reprinted, rewritten or recirculated without written permission.

Today Only: iPads Being Sold for $14.05

# EXHIBIT I

**Daniel J. Hurtado**
Attorney at Law
841 North Grove Avenue
Oak Park, Illinois 60302
(708) 289- 2503
Dhurtado2@att.net

October 29, 2010

**BY EMAIL**

Cameron A. Stracher, Esq.
One Park Avenue
Third Floor
New York, NY 10016

**Re:    Kevin Trudeau/ConsumerAffairs.com, Inc.**

Dear Mr. Stracher:

This letter responds to your letter of this date. Unfortunately, your client's response does not satisfy our concerns. First, setting aside the legal arguments, it is surprising that your client would not want to fully correct and retract its manifest error based purely on a desire to adhere to journalistic standards of integrity and to maintain its own credibility.

Second, the legal arguments set forth in your letter are wholly without merit. Your client's published statements regarding Mr. Trudeau are not remotely true, much less "substantially true." Your letter's quote from the *Masson* case omits critical language: "*Minor inaccuracies do not amount to* falsity so long as the substance, the gist, the sting, of the libelous charge be justified." *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 517 (1991) (emphasis added to show omitted language). With all due respect, it is ludicrous to characterize as "minor inaccuracies" your client's representations that the district court found that Mr. Trudeau violated numerous consumer fraud laws, that the First Circuit Court of Appeals affirmed such a finding, and that the Court of Appeals affirmed a multi-million dollar judgment against him. The fact that Mr. Trudeau appeared in 2002 as a host in one of the subject infomercials does not render those statements "minor inaccuracies" or "substantially true." Likewise, it is not a "minor inaccuracy" to imply that Mr. Trudeau is awaiting sentencing on a criminal contempt conviction, when he is not. Surely you are not arguing that there is no material distinction between being charged with a crime and being *convicted* of a crime.

Third, as to the amount of damages that Mr. Trudeau could establish, that is an issue for trial, if that is the route your client would like us to pursue.

Finally, though we are glad to see that the defamatory lead-in has been removed from your client's home-page (after two days of defamatory injury), the revisions to the full article that remains on the site are inadequate. The article continues to make false and defamatory statements about Mr. Trudeau. The revised headline, "Appeals Court Upholds FTC in Kevin

Trudeau Case," clearly implies that Mr. Trudeau is a defendant, if not *the* defendant, in the case, and therefore that all of the adverse rulings in the case apply to Mr. Trudeau. That inference is reinforced by the erroneous statement that the Court of Appeals affirmed a lower court ruling that the defendants "violated an FTC order banning Trudeau from doing any further infomercials." The *Direct Marketing* case does not involve any court orders that apply to Mr. Trudeau. The false inference that Trudeau was a party to the *Direct Marketing* case is further reinforced by the statement, "In its ruling, the First Circuit found the lower courts ruled correctly in ordering *Trudeau and the other defendants* to turn over the gross receipts from the sale of the products." (Emphasis added.)

My client perceives this as gamesmanship and a lack of good faith on the part of your client. Your client's publication was (and remains) patently false, and your client should want to do the right thing by completely removing the article and publishing a retraction. The fact that your client is disingenuously trying to preserve the defamatory message demonstrates that the initial publication was not the result of mere incompetence, but the result of malicious intent.

We do not believe this is a matter that lends itself to negotiation. Mr. Trudeau reiterates his demand that Mr. Huffman's article be removed from the site, and that your client publish a full retraction on the front page of the ConsumerAffairs.com website, with the same prominence and exposure as was afforded the original defamatory article. We ask that those corrective measures being accomplished by the end of the day on Sunday, October 31, 2010, in order to avoid legal action.

Very truly yours,

Daniel J. Hurtado
Counsel to Kevin Trudeau

# EXHIBIT J

**Daniel Hurtado**

| | |
|---|---|
| **From:** | Cameron Stracher [cam@stracherlaw.com] |
| **Sent:** | Saturday, October 30, 2010 1:48 PM |
| **To:** | Daniel Hurtado |
| **Subject:** | Re: ConsumerAffairs |

Respectfully, we can disagree about the application of the law to the facts -- and I note that the lack of damages is not a jury issue but precludes a defamation claim in these circumstances. *See* Robert D. Sack, *Sack on Defamation: Libel Slander & Related Problems* § 2.4.18, at 2-74 (West 2006) ("where true statements accompany a false one and the 'incremental harm' done by the falsity is negligible, recovery is . . . forbidden"). But, in any event, further discussion is not necessary because the article no longer appears on Consumer Affairs' website.

regards,
Cameron.

On Oct 29, 2010, at 6:34 PM, Daniel Hurtado wrote:

Mr. Stracher-

Please see the attached letter.

Dan Hurtado


<Letter to Cameron Stracher.pdf>


**Cameron Stracher**
One Park Avenue, 3rd Floor, NY, NY 10013
4 North Pasture Road, Westport, CT 06880

Phone: 212.743-6513 (NY); 203.222.7169 (CT & Fax)
Cell: 917.501.6202
cam@stracherlaw.com