IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| KEVIN TRUDEAU, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 10 C 7193 |
| v. ) | |
| ) | Judge Joan H. Lefkow |
| CONSUMERAFFAIRS.COM, INC., ) | |
| a California corporation, JAMES R. HOOD, ) | |
| and MARK HUFFMAN, ) | |
| ) | |
| Defendants. ) | |

## OPINION AND ORDER

Kevin Trudeau filed a defamation suit against ConsumerAffairs.com, Inc. ("ConsumerAffairs"), James R. Hood, and Mark Huffman (collectively, "defendants"), alleging that defendants published false statements on the ConsumerAffairs website about Trudeau.[1] Before the court are defendants' motion to dismiss pursuant to the Citizen Participation Act ("CPA"), 735 Ill. Comp. Stat. 110/1 *et seq.*, and alternative motion to dismiss for failure to state a claim. For the following reasons, the motions [#20, 23] are denied.

## BACKGROUND

**I.    The Complaint**[2]

Trudeau is an author, radio show host, and consumer advocate whose work has brought him into frequent contact with government agencies, particularly the Federal Trade Commission ("FTC"). ConsumerAffairs runs a website focused on providing consumer news and advocacy.

---

[1] The court has jurisdiction pursuant to 28 U.S.C. § 1332.

[2] The facts recounted in this section are taken from the complaint and attached documents and are presumed true for the purpose of resolving the pending motions.

Hood is the founder and chief executive officer of ConsumerAffairs. Huffman is a reporter for ConsumerAffairs. ConsumerAffairs holds itself out to the public as an organization that works with other media outlets and law enforcement entities "to expose and prosecute illegal and unfair business activities." Compl. ¶ 11.

On October 26, 2010, ConsumerAffairs published a lead-in article on its homepage entitled "What Kevin Trudeau Doesn't Want You to Know." The text of this article read:

> Don't tell him we told you, but Kevin Trudeau had a bad day in court. A federal appeals court upheld fines totaling millions of dollars and said Trudeau's arguments had "no more substance in them than the . . . infomercials." The appeals court upheld a lower court's finding that the onetime king of the infomercial had violated numerous consumer fraud laws. Trudeau is also awaiting sentencing on a criminal contempt charge.

Ex. A to Compl. This lead-in article linked to a full article entitled "Kevin Trudeau Loses Appeal of $54 Million Judgment" and authored by Huffman. The opening paragraph of the article stated that Trudeau lost his bid to overturn a judgment requiring him to pay millions to the FTC and that he also awaited sentencing on an unrelated criminal contempt charge. The article continued that the First Circuit Court of Appeals found that "Trudeau violated the FTC ban on his infomercials, as well as numerous consumer fraud laws." It then quoted from the First Circuit's opinion in *FTC* v. *Direct Marketing Concepts, Inc.*, 642 F.3d 1 (1st Cir. 2010), which was issued on October 21, 2010.[3] The article identified the defendants in the First Circuit case.

---

[3] The First Circuit case was based in part on an infomercial for coral calcium that Trudeau hosted in 2001. In 2004, the FTC filed a complaint in the United States District Court for the District of Massachusetts against the producers and distributors of the infomercial, including Direct Marketing Concepts, Inc., ITV Direct, Inc., Donald Barrett, Robert Maihos, and BP International. The district court granted summary judgment against the defendants on liability, finding that the infomercial was misleading as a matter of law. It then held a bench trial on damages, entering orders permanently enjoining the defendants from running the coral calcium infomercial and ordering disgorgement of $48,220,499.12 ($33,575,562.88 derived from the sale of coral calcium) from the defendants, excluding BP International, and of $574,274.23 from BP International. The First Circuit Court of Appeals affirmed

Trudeau was not among them. It then described the coral calcium infomercial that was at issue in the case, quoting portions of the infomercial dialogue between Trudeau and Dr. Robert Barefoot. The article reported that "the 1st Circuit found the lower courts ruled correctly in ordering Trudeau and the other defendants to turn over the gross receipts from the sale of the products." Ex. B to Compl. Trudeau, however, has not been found by any court to have violated consumer fraud laws, was not awaiting sentencing on a criminal contempt charge or any other criminal charge at the time the article was published, and was never a party to the case described in the article.

The evening the article was published, Trudeau's counsel sent an email to ConsumerAffairs notifying defendants of the errors in their article and asking defendants to immediately retract these statements. Counsel also left a voicemail message to the same effect. After hearing no response, on October 27, 2010, counsel left another voicemail and sent another letter addressed to Hood demanding a full retraction and reserving the right to pursue legal remedies. On October 28, 2010, counsel for defendants spoke with Trudeau's counsel. During this conversation, Trudeau's counsel again reiterated his demand for a full retraction of the false statements. Trudeau memorialized this demand in an email to defendants' counsel and also requested that the article be removed from the website while defendants considered Trudeau's request that a retraction be published.

On October 29, 2010, revisions were made to the article. The headline now read "Appeals Court Upholds FTC in Kevin Trudeau Case." The introductory paragraph explained that an appellate court agreed with the FTC "in a case involving Coral Calcium products hawked

---

the district court's rulings.

by infomercial king Kevin Trudeau." Ex. H to Compl. It then clarified that the First Circuit affirmed a ruling that "companies for whom Trudeau acted as a spokesman had engaged in deceptive advertising, committed consumer fraud and violated an FTC order banning Trudeau from doing any further infomercials." *Id.* The statement about the First Circuit affirming the lower court's order that Trudeau and others turn over the gross receipts from the sale of the products from the October 26, 2010 article remained the same.

That same day, Trudeau's counsel informed defendants' counsel that the revisions did not adequately address Trudeau's concerns and requested that the article be completely removed from the website and that a full retraction be published by October 31, 2010 to avoid legal action. Defendants' counsel responded the following day that the article was removed from the ConsumerAffairs website. No retraction was published.

## II.    Judicially Noticeable Facts

Defendants ask the court to take judicial notice of a myriad of documents from court filings involving Trudeau. Trudeau argues that the court cannot consider this extrinsic evidence without converting defendants' motion to dismiss to one for summary judgment pursuant to Federal Rule of Civil Procedure 12(d). Trudeau has submitted several documents of his own to "correct the Defendants' misinterpretation of the extrinsic materials." Dkt. No. 31 at 3 n.3. A court may take judicial notice of an adjudicative fact that is "not subject to reasonable dispute" and either "generally known within the territorial jurisdiction of the trial court" or "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). While the court will take judicial notice of the court documents provided by defendants for the limited purpose of recognizing the fact of litigation

and related judicial actions, it will not consider the documents for the truth of the matters asserted therein. *See Gen. Elec. Capital Corp.* v. *Lease Resolution Corp.*, 128 F.3d 1074, 1082 n.6 (7th Cir. 1997); *Global Relief Found.* v. *New York Times Co.*, No. 01 C 8821, 2002 WL 31045394, at *4 (N.D. Ill. Sept. 11, 2002) ("Judicial notice is most frequently used for noticing the contents of court records such as judicial orders or decrees. Typically, the notice of a court order is limited to the purpose of recognizing the judicial act or litigation, but not for the truth of the matters asserted in the document." (citations omitted)). As the truth of the matters asserted will not be considered, the court will also not take into account the extrinsic material provided by Trudeau.

Thus, the court takes judicial notice of the following: In 1998, after the FTC filed a complaint against Trudeau in this court, the parties agreed to a stipulated order that prohibited Trudeau from making certain unsubstantiated representations in connection with the promotion and advertising of certain products, among other things. The order also regulated Trudeau's ability to produce infomercials and required him to post a $500,000 bond in connection with the making of infomercials. Trudeau also agreed to pay $500,000 to the FTC to provide redress to purchasers of certain products he had promoted. In 2003, the FTC sought to hold Trudeau in civil contempt for violation of the 1998 order and filed a separate complaint for his participation in an infomercial related to coral calcium.[4] A stipulated preliminary injunction order was entered that provided that Trudeau could not make any representations that coral calcium was an effective treatment for cancer and several other named diseases. In June 2004, Trudeau was held in civil contempt for violating the preliminary injunction by promoting coral calcium and was

---

[4] This coral calcium infomercial is not related to that at issue in the First Circuit case.

ordered not to promote, advertise, market, or distribute it. Trudeau and the FTC then agreed to a stipulated permanent injunction and settlement of claims in the 2003 proceeding. The permanent injunction replaced the 1998 order. Trudeau was prohibited from producing, disseminating, making, or helping others make infomercials, except in connection with certain books and as long as any infomercial did not misrepresent the content of the book. Trudeau was also ordered to pay $2 million to the FTC for consumer redress. In 2007, the FTC returned to this court seeking an order for Trudeau to show cause why he should not be held in contempt for violating the 2004 injunction by misrepresenting the contents of his book, *The Weight Loss Cure "They" Don't Want You to Know About*, in infomercials. After an evidentiary hearing, the court held Trudeau in contempt. It initially imposed a monetary sanction of $5,173,000, representing a conservative estimate of the royalties Trudeau realized from the sale of the weight loss book, and enjoined Trudeau from participating in the production or publication of any infomercial for a product in which he had an interest for a period of three years. The court later revised the monetary sanction, ordering Trudeau to pay the FTC $37,616,161, an approximation of the loss consumers suffered as a result of the weight loss infomercials. Trudeau appealed. The Seventh Circuit affirmed the contempt finding but vacated the monetary sanction and infomercial ban, remanding for further proceedings. The district court reimposed the monetary sanction of $37,616,161. That decision is currently on appeal. A separate proceeding was instituted for Trudeau to show cause why he should not be held in criminal contempt of the 2004 injunction. That case is currently being prosecuted by the United States Attorney for the Northern District of Illinois.

In February 2010, while the civil contempt proceedings were ongoing, Trudeau encouraged his supporters to directly email the court in support of him. After the court received numerous emails, it held Trudeau in direct criminal contempt and sentenced him to thirty days in jail. The Seventh Circuit vacated the finding of contempt and the sentence on May 20, 2010. The matter was then referred to the United States Attorney for the Northern District of Illinois for prosecution and was reassigned to a different judge. No further action in this criminal contempt proceeding appears to have taken place.

## LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) challenges a complaint for failure to state a claim upon which relief may be granted. Fed. R. Civ. P. 12(b)(6); *Gen. Elec. Capital Corp.*, 128 F.3d at 1080. In ruling on a motion to dismiss, the court accepts as true all well-pleaded facts in the plaintiff's complaint and draws all reasonable inferences in the plaintiff's favor. *Nixon* v. *Page*, 291 F.3d 485, 486 (7th Cir. 2002). In order to survive a 12(b)(6) motion, the complaint must not only provide the defendant with fair notice of the claim's basis, but must also establish that the requested relief is plausible on its face. *Ashcroft* v. *Iqbal*, --- U.S. ----, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009); *see also Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). The allegations in the complaint must be "enough to raise a right of relief above the speculative level." *Twombly*, 550 U.S. at 555. At the same time, the plaintiff need not plead legal theories. *Hatmaker* v. *Mem'l Med. Ctr.*, 619 F.3d 741, 743 (7th Cir. 2010). Rather, it is the facts that count.

## ANALYSIS[5]

### I. The Citizen Participation Act

Defendants argue that Trudeau's suit is barred by the CPA, as the article[6] was published in furtherance of their right to free speech. The CPA is Illinois's anti-SLAPP (Strategic Lawsuits Against Public Participation) law, which was enacted in August 2007. It was passed in response to SLAPP suits,[7] the threat of which "significantly chills and diminishes citizen participation in government, voluntary public service, and the exercise of these important constitutional rights" and "intimidat[es], harass[es], [and] punish[es] citizens and organizations for involving themselves in public affairs." 735 Ill. Comp. Stat. 110/5. The CPA's purpose is

> to strike a balance between the rights of persons to petition, speak freely, associate freely, and otherwise participate in government; to protect and encourage public participation in government to the maximum extent permitted by law; to establish an efficient process for identification and adjudication of SLAPPs; and to provide for attorney's fees and costs to prevailing movants.

*Id.* The CPA applies to "any motion to dispose of a claim in a judicial proceeding on the grounds that the claim is based on, relates to, or is in response to any act or acts of the moving

---

[5] The parties do not dispute that Illinois law applies to this case. *See Kamelgard* v. *Macura*, 585 F.3d 334, 341 (7th Cir. 2009) ("When the defamatory statement is communicated in many different states, it makes sense to apply the law of the plaintiff's domicile, and that is the usual result in Illinois."); *Cook* v. *Winfrey*, 141 F.3d 322, 329 (7th Cir. 1998) ("A federal court sitting in diversity applies the choice of law rules of the state in which it sits. . . . [I]n multistate defamation cases, Illinois cases indicate that 'the applicable law is that of the victim's domicile, period.'" (quoting *Rice* v. *Nova Biomedical Corp.*, 38 F.3d 909, 916 (7th Cir. 1994))).

[6] Although there are in fact three articles at issue, like the parties, the court will refer to them collectively as "the article."

[7] A SLAPP suit is generally considered one involving "communications made to influence a governmental action or outcome," that "secondarily, result[s] in . . . a civil complaint or counterclaim . . . filed against nongovernment[al] individuals or organizations . . . on . . . a substantive issue of some public interest or social significance." Mark J. Sobczak, *SLAPPed in Illinois: The Scope & Applicability of the Illinois Citizen Participation Act*, 28 N. Ill. U. L. Rev. 559, 562 (2008) (alterations in original) (quoting Professors George W. Pring and Penelope Canan, "regarded as the seminal experts on the subject").

party in furtherance of the moving party's rights of petition, speech, association, or to otherwise participate in government." 735 Ill. Comp. Stat. 110/15. It creates an immunity for acts in furtherance of these rights, "regardless of intent or purpose, except when not genuinely aimed at procuring favorable government action, result, or outcome." *Id.* The CPA requires a court to dismiss claims to which it applies unless the plaintiff produces clear and convincing evidence that the defendant's acts "are not immunized from, or are not in furtherance of acts immunized from, liability" by the CPA. 735 Ill. Comp. Stat. 110/20. Government is defined expansively to include the electorate. 735 Ill. Comp. Stat. 110/10. The CPA "shall be construed liberally to effectuate its purposes and intent fully." 735 Ill. Comp. Stat. 110/30(b).

> A.   CPA's Application in Federal Court

Trudeau first argues that the CPA does not apply in federal court, as it is a procedural rule that addresses whether a suit may proceed past the pleading stage or to trial in conflict with Federal Rules of Civil Procedure 12 and 56. A federal court sitting in diversity applies state substantive law and federal procedural law. *See, e.g.*, *Hanna* v. *Plumer*, 380 U.S. 460, 465, 85 S. Ct. 1136, 14 L. Ed. 2d 8 (1965). "A substantive law is one motivated by a desire to influence conduct outside the litigation process, such as a desire to deter accidents, while a procedural law is one motivated by a desire to reduce the cost or increase the accuracy of the litigation process, regardless of the substantive basis of the particular litigation." *Gacek* v. *Am. Airlines, Inc.*, 614 F.3d 298, 302 (7th Cir. 2010). "If an ostensibly procedural rule of state law is confined to a particular substantive area of law, this suggests that it probably was motivated by substantive concerns and therefore should be applied by the federal court in a case governed by state law." *Id.* But where a federal rule "answers the question in dispute," it applies over the state law

9

unless it exceeds statutory authorization or Congress's rulemaking power. *Shady Grove Orthopedic Assocs., P.A.* v. *Allstate Ins. Co.*, --- U.S. ----, 130 S. Ct. 1431, 1437, 176 L. Ed. 2d 311 (2010).

Here, the CPA creates a new category of immunity against claims related to a defendant's exercise of his or her First Amendment rights. While it also provides for a procedure to enforce this immunity, it is not intended as a substitute for the federal rules. Rather, it is a "supplemental and substantive rule to provide added protections, beyond those in Rules 12 and 56, to defendants who are named as parties because of constitutional [First Amendment] activities." *Godin* v. *Schencks*, 629 F.3d 79, 88 (1st Cir. 2010). The CPA places the burden of proof on the plaintiff to defeat a motion brought under the CPA. The allocation of the burden of proof is substantive in nature for *Erie* purposes. *Palmer* v. *Hoffman*, 318 U.S. 109, 117, 63 S. Ct. 477, 87 L. Ed. 645 (1943); *Roberts & Schaefer Co.* v. *Merit Contracting, Inc.*, 99 F.3d 248, 253 n.2 (7th Cir. 1996). Further, the immunity created by the CPA is motivated by substantive concerns, and, along with the provision of mandatory attorney's fees to a prevailing moving party, is "plainly meant to affect conduct outside of the litigation process, such as a person's decision to exercise his First Amendment rights without fear of retaliation." *Chi* v. *Loyola Univ. Med. Ctr.*, --- F. Supp. 2d ----, 2011 WL 2020865, at *9 (N.D. Ill. May 24, 2011). It provides a substantive affirmative defense to plaintiff's complaint, something Rules 12 and 56 do not do. *See Satkar Hospitality Inc.* v. *Cook County Bd. of Review*, No. 10 C 6682, 2011 WL 2182106, at *4 (N.D. Ill. June 2, 2011). The Illinois Appellate Court's conclusion that the CPA is procedural for retroactivity purposes in *Shoreline Towers Condominium Association* v. *Gassman*, 936 N.E.2d 1198, 1208, 404 Ill. App. 3d 1013, 344 Ill. Dec. 441 (2010), does not preclude finding that the

10

CPA's provision of immunity is substantive for *Erie* purposes. *See Sun Oil Co.* v. *Wortman*, 486 U.S. 717, 726–27, 108 S. Ct. 2117, 100 L. Ed. 2d 743 (1988) ("Except at the extremes, the terms 'substance' and 'procedure' precisely describe very little except a dichotomy, and what they mean in a particular context is largely determined by the purposes for which the dichotomy is drawn."). Thus, as Rules 12 and 56 are not so broad as to preclude application of the CPA and the relevant CPA provisions are substantive in nature, the court will consider whether the CPA bars Trudeau's claim. *See also United States ex rel. Newsham* v. *Lockheed Missiles & Space Co.*, 190 F.3d 963, 972–73 (9th Cir. 1999); *Containment Techs. Grp., Inc.* v. *Am. Soc'y of Health Sys. Pharmacists*, No. 07-cv-0997-DFH-TAB, 2009 WL 838549, at *8 (S.D. Ind. Mar. 26, 2009).

### B.     Application to Trudeau's Claim

CPA immunity applies where

> (1) the defendant's acts were in furtherance of his rights to petition, speak, associate, or otherwise participate in government to obtain favorable government action; (2) the plaintiff's claim is based on, related to, or in response to the defendant's "acts in furtherance"; and (3) the plaintiff fails to produce clear and convincing evidence that the defendant's acts were *not* genuinely aimed at procuring favorable government action.

*Sandholm* v. *Kuecker*, 942 N.E.2d 544, 564, 405 Ill. App. 3d 835, 347 Ill. Dec. 341 (2010), *perm. app. granted*, 943 N.E.2d 1109, 239 Ill. 2d 589, 348 Ill. Dec. 199 (2011). In determining whether acts were not aimed at procuring favorable government action, a two-part test based on the *Noerr-Pennington* doctrine is applied. *Id.* at 566-67. The court is "to first consider whether objective persons could have reasonably expected to procure a favorable government outcome" in taking the allegedly immunized action. *Id.* at 568. If so, then immunity applies. *Id.* at 569. If not, "then the court would consider whether defendants' subjective intent was not to achieve a

government outcome that may interfere with plaintiff but rather to interfere with plaintiff by using the governmental process itself." *Id.* Defendants' acts need "only to be made within [their] participation in the government process, which includes acts of gaining public support to influence favorable government action." *Id.* at 570.

Defendants argue that they "publicize[ ] consumer concerns in an effort to draw attention to the consumer harm caused by activities like Trudeau's." Dkt. No. 20 at 12. According to defendants, their publishing of the article was "an attempt . . . to provide information and commentary about government efforts to enforce consumer protection laws." *Id.* But this stretches the CPA beyond its intended purpose, for it is disingenuous to claim that defendants were attempting to influence government action or gain public support by authoring and publishing a purely informative report on an appellate court decision. No reasonable person would consider the article to have been an act of participation in the government process or expect the article to influence the electorate to take some unspecified action with respect to consumer protection. Were the allegedly defamatory statements not ones purportedly taken from court proceedings but rather statements made by an individual advocating a certain position, the outcome might be different. *See, e.g.*, *Wright Dev. Grp., LLC* v. *Walsh*, 939 N.E.2d 389, 238 Ill. 2d 620, 345 Ill. Dec. 546 (2010) (defendant's statements made to a reporter after a public meeting discussing problems with a condominium developer and potential legislation were protected by the CPA); *Sandholm*, 942 N.E.2d 544 (defendants' allegedly defamatory statements were made as part of an effort to remove plaintiff from his position as a high school athletic director); *Shoreline Towers*, 936 N.E.2d 1198 (defendant's statements, complaints, and lawsuits regarding religious discrimination were made in an effort to change certain policies regarding the

display of religious objects). Here, however, attempting to fit defendants' actions into the CPA's protections goes well beyond the CPA's purpose of promoting public participation in government. Although the CPA's scope is broader than other anti-SLAPP statutes across the country, *Hytel Grp., Inc.* v. *Butler*, 938 N.E.2d 542, 556 n.3, 405 Ill. App. 3d 113, 345 Ill. Dec. 103 (2010), construing it to reach this situation is untenable.[8] There was no use of the governmental process involved in authoring and publishing the article. Allowing this suit, which lacks the hallmarks of a SLAPP suit, to go forward will not chill or diminish citizen participation in public affairs. Because defendants' statements about Trudeau in the article were not genuinely aimed at procuring favorable government action, the CPA does not bar Trudeau's suit.

## II.     Defendants' Alternative Arguments under Rule 12(b)(6)

Under Illinois law, in order to state a claim for defamation, a plaintiff must allege that the defendant made a false statement about the plaintiff, that the statement was published to a third party, and that the publication of the false statement caused damage to the plaintiff. *Solaia Tech., LLC* v. *Specialty Publ'g Co.*, 852 N.E.2d 825, 839, 221 Ill. 2d 558, 304 Ill. Dec. 369 (2006). Where a statement is defamatory *per se*, a plaintiff need not prove special damages. *See, e.g.*, *Gardner* v. *Senior Living Sys., Inc.*, 731 N.E.2d 350, 354, 314 Ill. App. 3d 114, 246 Ill. Dec. 822 (2000). Defendants do not appear to contest that the allegedly false statements fall into one of the categories of statements that qualify as defamatory *per se*, namely words that impute

---

[8] The argument underlying defendants' CPA motion bears striking resemblance to a prediction made by several practitioners soon after the CPA's passage as to how media defendants would attempt to use the CPA. Defendants "invoke this new immunity because they can simply argue that their publications' readership is the 'electorate' and that the goal of a particular article – which contains defamatory statements – is to 'procure favorable government action' on any given topic." Eric M. Madiar & Terrence J. Sheahan, *Illinois' New Anti-SLAPP Statute*, 96 Ill. B.J. 620, 625 (Dec. 2008). The court is not convinced that this "creative interpretation" of the CPA's scope was intended by the Illinois legislature.

the commission of a criminal offense. *See Bryson* v. *News Am. Publ'ns, Inc.*, 672 N.E.2d 1207, 1214, 174 Ill. 2d 77, 220 Ill. Dec. 195 (1996). Instead, defendants argue that Trudeau's claim should be dismissed because the article is substantially true and Trudeau cannot claim to have suffered any incremental harm as a result of any inaccuracies in the article.

      A.      **Substantial Truth**

Truth is a defense to a defamation action. *Hnilica* v. *Rizza Chevrolet, Inc.*, 893 N.E.2d 928, 931, 384 Ill. App. 3d 94, 323 Ill. Dec. 454 (2008). To prevail on this defense, defendants need only show that the statement at issue is substantially true, i.e., that the "gist" or "sting" of the statement is true. *J. Maki Constr. Co.* v. *Chicago Reg'l Council of Carpenters*, 882 N.E.2d 1173, 1186, 379 Ill. App. 3d 189, 318 Ill. Dec. 50 (2008). To determine the gist or sting of the allegedly defamatory statement, the court must "look at the highlight of the article, the pertinent angle of it, and not to items of secondary importance which are inoffensive details, immaterial to the truth of the defamatory statement." *Vachet* v. *Cent. Newspapers, Inc.*, 816 F.2d 313, 316 (7th Cir. 1987). Whether a statement is substantially true is normally a jury question. *Harrison* v. *Chicago Sun-Times, Inc.*, 793 N.E.2d 760, 767, 341 Ill. App. 3d 555, 276 Ill. Dec. 1 (2003). While a plaintiff need not anticipate affirmative defenses in his complaint, *U.S. Gypsum Co.* v. *Indiana Gas Co.*, 350 F.3d 623, 626 (7th Cir. 2003), "[a] motion to dismiss on grounds of truth may be proper, for example, if the plaintiff more or less concedes the essential truth of the alleged defamatory statement, or if there is no basis for a reasonable jury to find that the alleged defamatory statement was not substantially true even as framed in the plaintiff's own allegations." *Lynch* v. *Young*, No. 04 C 5136, 2005 WL 946881, at *5 (N.D. Ill. Mar. 9, 2005).

Trudeau complains that the article contained several defamatory statements, including the following: (1) a federal appeals court "upheld a lower court's finding that the onetime king of the infomercial [Trudeau] had violated numerous consumer fraud laws"; (2) "Trudeau is also awaiting sentencing on a criminal contempt charge"; (3) "Infomercial king Kevin Trudeau . . . has lost his bid to overturn a judgment requiring him to pay millions to the Federal Trade Commission"; (4) "The First Circuit Court of Appeals ruled for the FTC, finding that Trudeau violated the FTC ban on his infomercials, as well as numerous consumer fraud laws"; and (5) the district court found "Defendants liable for deceptive advertising." Trudeau maintains that these are false statements, as he has never been found by any court to be in violation of the FTC Act or any similar consumer fraud law, was not awaiting sentencing on a criminal contempt charge or any other criminal charge, and was not a party to the case discussed in the ConsumerAffairs article in either the District of Massachusetts or the First Circuit. Defendants contend that the gist of the article is that Trudeau was involved in producing deceptive advertisements of coral calcium and he disobeyed court orders. Trudeau, on the other hand, argues that the gist of the defamatory material was that Trudeau was found to have violated numerous consumer fraud laws and had been held in criminal contempt. As the gist of the article is open to debate, the court is not prepared to find at this stage that, as a matter of law, the inaccurate details (namely that (1) Trudeau was a party to the First Circuit case; (2) Trudeau was found to have violated numerous consumer fraud laws; and (3) Trudeau was, at the time of publication, convicted of criminal contempt) are of secondary importance and immaterial to the gist of the defamatory statement.

    **B.**    **Incremental Harm**

Defendants next argue that the doctrine of incremental harm bars Trudeau's claim. This defense provides that "[i]f a false accusation cannot do any incremental harm to the plaintiff's deserved reputation because the truth if known would have demolished his reputation already, he has not been harmed by the false accusation and therefore has no remedy." *Desnick* v. *Am. Broad. Cos.*, 44 F.3d 1345, 1350 (7th Cir. 1995) (citing *Haynes* v. *Alfred Knopf, Inc.*, 8 F.3d 1222, 1227–29 (7th Cir. 1993)); *see also Myers* v. *The Telegraph*, 773 N.E.2d 192, 199, 332 Ill. App. 3d 917, 265 Ill. Dec. 830 (2002) ("The incremental-harm doctrine bars recovery for any false and defamatory statements whose potential damaging effect is outweighed, as a matter of law, by other harmful, but true, text in the same publication."). The false accusation must be closely related to the true facts. *Id.* This defense "protects defendants who make unflattering and false statements, if the court or jury determines that the false statements did no greater damage to the plaintiff's reputation than telling the truth would have done." *Myers*, 773 N.E.2d at 199.

The Seventh Circuit applied the incremental harm defense under the guise of "substantial truth" in *Desnick* and *Haynes*. *Desnick*, 44 F.3d at 1350 ("The doctrine that we have been describing goes by the name of 'substantial truth.'"); *Haynes*, 8 F.3d at 1228 ("The rule of substantial truth is based on a recognition that falsehoods which do no *incremental* damage to the plaintiff's reputation do not injure the only interest that the law of defamation protects."). No Illinois court, however, has explicitly adopted the defense, and the Illinois Appellate Court, in *Myers*, declined to do so. *Myers*, 773 N.E.2d at 200. The *Myers* court reasoned that, if the incremental harm defense was viable, it would lead to a mini-trial to determine the plaintiff's deserved reputation instead of focusing on the main objective of a defamation action, whether

16

the alleged defamatory statement is true or false. *Id.* It also found the defense to be in conflict with the presumption of damages that accompanies *per se* actions, for in order to overcome the incremental harm defense, a plaintiff would have to prove special damages. *Id.*

Sitting in diversity, this court is to apply the substantive law of Illinois as it has been determined by its supreme court. *Allstate Ins. Co.* v. *Menards, Inc.*, 285 F.3d 630, 637 (7th Cir. 2002). Where the state's highest court has not ruled on the issue, as here, the court "ought to give great weight to the holdings of the state's intermediate appellate courts and ought to deviate from those holdings only when there are persuasive indications that the highest court of the state would decide the case differently from the decision of the intermediate appellate court." *Id.* Although faced with competing indications from the Seventh Circuit and the Illinois Appellate Court as to the viability of the incremental harm defense, the court need not decide the issue now. Because there has been no discovery and the court has not taken judicial notice of the documents defendants attached to their motion for the truth of the matters asserted therein, the court cannot say that Trudeau could not have been harmed by the false statements in the article. *See Desnick*, 44 F.3d at 1350–51 (finding that a defamation claim was improperly dismissed where it was not clear from the pleadings that the incremental harm defense applied). Trudeau will be allowed to proceed with his claim. Whether the incremental harm defense should apply may be reconsidered on a more developed record.

**CONCLUSION AND ORDER**

For the foregoing reasons, defendants' motions [#20, 23] are denied. Defendants have until September 27, 2011 to answer the complaint. This case will be called for a status hearing on October 4, 2011 at 8:30 a.m.

Dated: September 6, 2011        Enter: _____
                                                        JOAN HUMPHREY LEFKOW
                                                          United States District Judge